[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Jackson,* Slip Opinion No. 2016-Ohio-5488.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-5488

THE STATE OF OHIO, APPELLEE, *v.* JACKSON, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Jackson,* Slip Opinion No. 2016-Ohio-5488.]

*Criminal Law—Aggravated murder—Sentence of death imposed after resentencing hearing—Death penalty affirmed.*

(No. 2012-1644—Submitted April 19, 2016—Decided August 24, 2016.)

APPEAL from the Court of Common Pleas of Trumbull County, No. 01-CR-794.

_____

PFEIFER, J.

{¶ 1} This is a death-penalty appeal as of right.  A jury convicted the defendant-appellant, Nathaniel Jackson, of the aggravated murder of Robert Fingerhut, with two death-penalty specifications.  Jackson was sentenced to death. This court affirmed Jackson's convictions and the death sentence on direct appeal. *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362.

{¶ 2} During a subsequent appeal from the trial court's denial of Jackson's motion for a new trial, the Eleventh District Court of Appeals vacated the death sentence, holding that the trial judge's use of the assistant prosecutor to assist in

preparation of the sentencing opinion was improper. The case was remanded to the trial court for resentencing. *State v. Jackson*, 190 Ohio App.3d 319, 2010-Ohio-5054, 941 N.E.2d 1221, ¶ 29, 33 (11th Dist.). On remand, the trial court again sentenced Jackson to death.

**{¶ 3}** For the following reasons, we affirm the trial court's resentencing of Jackson. Although we hold that the trial court in the sentencing opinion improperly failed to consider Jackson's allocution, the error was harmless and will be rectified by our independent sentence evaluation.

## I. Trial Evidence

**{¶ 4}** Our previous decision in this case sets forth the facts in detail. 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, at ¶ 2-74. For purposes of this opinion, we summarize the facts as follows.

**{¶ 5}** Donna Roberts lived with Robert Fingerhut, her former husband, in Howland Township, Trumbull County. Fingerhut, who operated Greyhound bus terminals in Warren and Youngstown, owned two insurance policies on his life, both of which named Roberts as sole beneficiary. The total death benefit of the two policies was $550,000.

**{¶ 6}** At some point, Jackson began an affair with Roberts. In 2001, the affair was interrupted by Jackson's confinement in the Lorain Correctional Institution. While Jackson was in prison, he and Roberts exchanged numerous letters and spoke on the telephone. Prison authorities recorded many of their telephone conversations.

**{¶ 7}** Passages from the letters and telephone calls indicated that the two plotted to murder Fingerhut. Jackson repeatedly pledged to kill Fingerhut upon Jackson's release from prison. In one letter, Jackson wrote, "Donna I don't care what you say but Robert has to go! An[d] I'm not gonna let you stop me this time." At Jackson's request, Roberts purchased a ski mask and a pair of gloves for Jackson to use during the murder. On the day before Jackson was released, he and Roberts

2

had one final recorded conversation. Jackson told her, "I got to do this Donna. I got to." He also told Roberts his plan: "I just need to be in that house when he come home. * * * Baby it ain't gonna happen in the house."

{¶ 8} Jackson was released on December 9, 2001. Roberts drove to Lorain to pick him up, spent that night with him in a motel, and spent much of the next two days with him as well. On December 11, 2001, Fingerhut was shot to death at his home.

{¶ 9} When police responded to the crime scene, Roberts was hysterical and asked them to do whatever was necessary to catch the killer. She also reported that Fingerhut's car had been stolen. During a search of the house, the police in a dresser in the master bedroom found 145 handwritten letters and cards that Jackson had sent to Roberts. In the trunk of Roberts's car, the police found a bag with Jackson's name on it containing clothes and 139 letters that Roberts had sent to Jackson. On December 12, Fingerhut's car was found in Youngstown.

{¶ 10} On December 21, 2001, Jackson was arrested at a friend's house in Youngstown. Jackson had a bandage around his left index finger at the time of his arrest. The police seized a pair of bloodstained gloves with the left index finger missing and a pair of tennis shoes from the house. The tread pattern on the shoes was consistent with a shoe print left in blood near Fingerhut's body.

{¶ 11} During a subsequent police interview, Jackson said, "I just didn't mean to do it, man." He then related his version of what happened, essentially claiming that he shot Fingerhut in self-defense. Jackson claimed to have known Fingerhut for a couple of years. Jackson said that on the evening of December 11, he approached Fingerhut about getting a job at the Youngstown bus terminal. They met later that evening, and Jackson sold Fingerhut "some weed." He then asked Fingerhut if he could go to Fingerhut's house to "chill" before starting work the next day, and Fingerhut gave Jackson a ride to Fingerhut's home. According to Jackson, after they went inside the home Fingerhut started making racial comments

and other disparaging remarks toward him. Fingerhut then pulled a revolver, Jackson tried to grab it, and Fingerhut shot Jackson in the finger as Jackson reached for the gun. Jackson then took the gun from Fingerhut during the "tussle" and shot him twice. Jackson was unsure where the shots hit Fingerhut but said that Fingerhut was still breathing when Jackson fled the house and drove away in Fingerhut's car.

{¶ 12} Fingerhut's autopsy showed that he had been shot three times, including a penetrating gunshot wound to the top of the head that was determined to be fatal. There was also a laceration between Fingerhut's left thumb and index finger, and further examination showed that the fatal bullet hit his hand before entering the top of his head. Gunshot residue on the body indicated that the distance from the muzzle of the firearm to the head wound was 24 inches or less.

{¶ 13} Finally, expert testimony established that the DNA profile of bloodstains found inside Fingerhut's car and on its trunk-release lever matched Jackson's DNA profile.

## II. Case History

### A. Indictment, trial, verdict, and appeal

{¶ 14} On December 28, 2001, a grand jury indicted Jackson on two counts of aggravated murder in violation of R.C. 2903.01(A) and (B). Both murder counts carried two felony-murder death-penalty specifications: murder during an aggravated burglary and murder during an aggravated robbery. R.C. 2929.04(A)(7). The grand jury also indicted Jackson on separate counts of aggravated burglary and aggravated robbery with a firearm specification on each count.

{¶ 15} During October and November 2002, Judge John Stuard presided over Jackson's capital murder trial. Before a jury, the state presented numerous witnesses establishing the facts. The defense presented three witnesses whose testimony revealed that documents for most of the property shared by Roberts and Fingerhut named Roberts as the owner. This evidence was intended to undermine

the financial motive for the killing asserted by the state. The jury found Jackson guilty as charged.

{¶ 16} At the conclusion of the penalty phase, the jury recommended death, and the court imposed the death sentence on Jackson.

{¶ 17} On January 4, 2006, we affirmed the verdict and sentence on Jackson's direct appeal. 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362.

*B. Roberts's trial and direct appeal*

{¶ 18} In May and June 2003, Judge Stuard presided over the capital murder trial of Donna Roberts. A jury found Roberts guilty of the aggravated murder of Fingerhut and other offenses, and she was sentenced to death.

{¶ 19} On August 2, 2006, we affirmed Roberts's convictions, including the convictions regarding aggravated murder and both death-penalty specifications. *State v. Roberts,* 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168 ("*Roberts I*"). But we vacated the death sentence and remanded the case to the trial court because the judge had enlisted the assistant county prosecutor who tried the case to participate in drafting the sentencing opinion, and in doing so, had engaged in improper ex parte communications. *Id*. at ¶ 153-164. (Although Judge Stuard also presided over Jackson's trial, no allegation was raised in Jackson's direct appeal to this court that the prosecutor participated in drafting the sentencing opinion or engaged in ex parte communications with the judge during that trial, and our January 2006 opinion affirming Jackson's convictions and death sentence accordingly did not address any issues of that type.)

{¶ 20} We ordered the following relief in *Roberts I*:

On remand, the trial judge will afford Roberts her right to allocute, and the trial court shall personally review and evaluate the evidence, weigh the aggravating circumstances against any relevant mitigating evidence, and determine anew the appropriateness of the death

penalty as required by R.C. 2929.03. The trial court will then personally prepare an entirely new penalty opinion as required by R.C. 2929.03(F) and conduct whatever other proceedings are required by law and consistent with this opinion.

*Id*. at ¶ 167.

### *C. Developments in the aftermath of* Roberts I

{¶ 21} Following *Roberts I*, on August 15, 2006, Jackson filed a motion in the trial court for leave to file a motion for a new sentencing hearing.

{¶ 22} On October 5, 2006, Jackson's attorney filed an affidavit of disqualification against Judge Stuard, seeking to prevent the judge from acting on any further trial or postconviction proceedings. On November 29, 2006, Chief Justice Moyer denied that affidavit, stating:

Judge Stuard has responded in writing to the affidavit. He acknowledges that he held the same kind of communications with the prosecuting attorney's office in both the Roberts and Jackson capital cases before sentencing each of them to death * * *. The judge states that he is prepared to reconsider the evidence and impose a new sentence in this case just as he has been ordered to do in the related Roberts case. He contends that his ex parte communications with the prosecuting attorney's office were administrative rather than substantive, and he states that the prosecuting attorney's office simply typed up his notes after he had independently weighed the evidence and reached a decision about the proper sentences for the two defendants.

I find no basis for ordering the disqualification of Judge Stuard. The judge is entitled to consider the defendant's motion for

6

relief from judgment now pending in the trial court, and if the judge concludes that relief is appropriate, he may grant that motion and conduct the new sentencing hearing * * *.

*In re Disqualification of Stuard*, 113 Ohio St.3d 1236, 2006-Ohio-7233, 863 N.E.2d 636, ¶ 4-5.

{¶ 23} On February 15, 2008, Judge Stuard granted Jackson's motion for leave to file a motion for a new sentencing hearing. On February 29, 2008, Jackson filed a motion "for a new trial and/or sentencing hearing" on the grounds that the prosecution impermissibly collaborated in the drafting of the sentencing opinion.

{¶ 24} On May 12, 2008, Jackson's attorneys filed a second affidavit of disqualification against Judge Stuard, premised on pending disciplinary proceedings that had been brought against Judge Stuard for enlisting the assistant prosecutor to prepare the sentencing opinion in Roberts's case and contending that Judge Stuard had shown his bias by refusing to grant Jackson the same relief that Roberts had received in her case. On August 20, 2008, Chief Justice Moyer denied that affidavit.

{¶ 25} On January 29, 2009, we publicly reprimanded Judge Stuard for violating the Canons of the Code of Judicial Conduct by engaging in "ex parte communications four times" with the assistant prosecutor "about the sentencing opinion in Roberts's case." *Disciplinary Counsel v. Stuard*, 121 Ohio St.3d 29, 2009-Ohio-261, 901 N.E.2d 788, ¶ 5, 16.

{¶ 26} On May 4, 2009, Judge Stuard denied Jackson's motion for a new trial or a new sentencing hearing, and Jackson appealed the denial to the Eleventh District.

### D. Remand of Jackson's case for resentencing

{¶ 27} On October 15, 2010, the court of appeals held that the judge's use of the prosecutor to assist in preparing the sentencing opinion in Jackson's case was

improper, vacated the sentence, and remanded for resentencing. 190 Ohio App.3d 319, 2010-Ohio-5054, 941 N.E.2d 1221, at ¶ 29, 33. The court mandated:

> In the case at bar, * * * the fact pattern is factually the same as that in *Roberts*. The record before us establishes that the same drafting procedures involving the sentencing entry that occurred in *Roberts* took place in the instant matter. * * * Based on the Supreme Court of Ohio's holding in *Roberts*, appellant is entitled to the same relief afforded to his co-defendant. Thus, the trial judge must personally review and evaluate the appropriateness of the death penalty, prepare an entirely new sentencing entry as required by R.C. 2929.03(F), and conduct whatever other proceedings are required by law and consistent with this opinion.

*Id*. at ¶ 29.

### E. Jackson's resentencing hearing

**{¶ 28}** On August 14, 2012, Judge Stuard conducted Jackson's resentencing hearing. As a preliminary matter, the judge overruled a defense motion for his voluntary recusal. He then proceeded with the hearing. During the hearing, Judge Stuard overruled a defense motion to allow Jackson to present additional mitigating evidence. Judge Stuard heard Jackson's allocution. He then sentenced Jackson to death and filed a sentencing opinion pursuant to R.C. 2929.03(F).

### F. Roberts's additional proceedings and appeals

**{¶ 29}** On remand in Roberts's case, Judge Stuard again sentenced her to death. Roberts appealed as of right to this court. On October 22, 2013, we held that the trial court in its sentencing opinion had erred in failing to consider the allocution Roberts made at her resentencing hearing and that this omission rendered the sentencing opinion "so inadequate as to severely handicap our ability to exercise

our power of independent review." *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1110, ¶ 69-72 ("*Roberts II*"). We vacated Roberts's death sentence and remanded the case for resentencing. *Id.* at ¶ 72, 96.

{¶ 30} On April 30, 2014, Judge Ronald Rice resentenced Roberts to death. Her appeal is currently pending in this court in case No. 2014-0989.

### III. Issues on Appeal

{¶ 31} In this appeal, Jackson raises 12 propositions of law. We will address his propositions out of order for ease of analysis.

A. *Trial judge's impartiality on resentencing* (Proposition of law III)

{¶ 32} Jackson argues that he was denied a fair and impartial trial judge on resentencing.

{¶ 33} Judicial bias is defined as

> a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and facts.

*State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus.

{¶ 34} Under Article IV, Section 5(C) of the Ohio Constitution, the chief justice or the chief justice's designee has sole authority to determine whether a trial judge is disqualified. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 145; *see State v. Moore*, 93 Ohio St.3d 649, 650, 758 N.E.2d 1130 (2001); *Beer v. Griffith*, 54 Ohio St.2d 440, 441, 377 N.E.2d 775 (1978).

### 1. Res judicata

**{¶ 35}** Jackson renews his claims that Judge Stuard had been unfair and should not have presided over his resentencing hearing. One of Jackson's arguments is that Judge Stuard delayed ruling on Jackson's motion for a new trial until after a mandamus action was filed against him. But Chief Justice Moyer considered similar arguments in ruling on Jackson's attorneys' second affidavit of disqualification and determined that the allegations did not establish bias or create a basis for disqualification. Thus, this claim is res judicata. *Hale* at ¶ 145; *State v. Rogers*, 17 Ohio St.3d 174, 186, 478 N.E.2d 984 (1985), *vacated on other grounds, sub nom. Rogers v. Ohio*, 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452 (1985).

### 2. Other bias claims

**{¶ 36}** First, Jackson argues that Judge Stuard demonstrated bias by denying his motion for a new sentencing hearing after Judge Stuard had stated in his response to the first affidavit of disqualification that he was prepared to grant such a motion. In a related argument, Jackson asserts that Judge Stuard displayed bias by refusing to accept this court's rulings in *Roberts I* and in the disciplinary action taken against him.

**{¶ 37}** In his affidavit filed in the first disqualification attempt, Judge Stuard stated that he had "essentially the same type of communications" with the assistant prosecutors in both the *Roberts* and *Jackson* cases. Jackson characterizes Judge Stuard's acknowledgement of wrongdoing as implicitly representing that he would cure the error. But Jackson asserts that Judge Stuard refused to concede any wrongdoing during the resentencing hearing when the judge stated, "You are all aware of the reason why this case is back here. The Supreme Court I think misunderstood what occurred, but they have made their ruling and I must abide by that." Jackson asserts that the judge then violated his implicit promise to cure the error by filing an almost identical copy of his prior sentencing opinion.

**{¶ 38}** In support of this claim, Jackson relies on Judge Cannon's concurring opinion in the case in which the Eleventh District remanded the matter for resentencing. In that opinion, Judge Cannon stated:

My decision that the trial judge should conduct a new sentencing hearing is based, in large measure, upon the representations made to the Supreme Court of Ohio by the trial judge. More than one affidavit to disqualify the trial judge was filed in this case. In November 2006, the trial judge filed an affidavit in response, opposing disqualification. In that affidavit, the trial judge acknowledged doing the same thing in this case that he did in *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, wherein the trial judge was ordered to conduct a new sentencing hearing. * * *

* * *

Because he acknowledged doing the same thing that resulted in prejudicial error in the *Roberts* case, the trial judge conceded prejudicial error in Jackson's case. And, by opposing disqualification, the trial judge implicitly represented that he could remain on the case for purposes of curing that error. Given the circumstances, it would appear that the trial judge recognized that he would be required to do the same thing he was ordered to do in *Roberts*, regardless of the nature of the proceedings (whether postconviction or direct appeal), if he were permitted to remain on the case.

190 Ohio App.3d 319, 2010-Ohio-5054, 941 N.E.2d 1221, at ¶ 35, 41 (Cannon, J., concurring).

{¶ 39} Judge Cannon in his concurrence explained his rationale for vacating Jackson's sentence and remanding the cause for resentencing. Yet none of Judge Cannon's remarks were made in the context of judicial bias. Thus, his concurring opinion does not support Jackson's bias claim.

{¶ 40} Despite his bias claims, Jackson fails to show that Judge Stuard displayed "a hostile feeling or spirit of ill will" toward him. *Pratt*, 164 Ohio St. 463, 132 N.E.2d 191, at paragraph four of the syllabus. Moreover, Judge Stuard's failure to provide the relief that Jackson believes was warranted does not establish actual bias. *See In re Disqualification of Floyd*, 135 Ohio St.3d 1249, 2012-Ohio-6336, 986 N.E.2d 10, ¶ 10 (the fact that a trial judge's decision "was reversed in a critical opinion by the appeals court does not imply that she will be biased against [the appellants] or somehow retaliate against them"). Thus, these claims lack merit.

{¶ 41} Second, Jackson claims that the judge was biased during the resentencing proceedings, because he refused to consider new mitigating evidence. The court of appeals directed Judge Stuard on remand to provide Jackson with "the same relief afforded to" Roberts. 190 Ohio App.3d 319, 2010-Ohio-5054, 941 N.E.2d 1221, at ¶ 29. Roberts was not allowed to introduce new mitigating evidence during her resentencing proceedings, and Judge Stuard approached Jackson's resentencing in the same fashion. *See Roberts II*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, at ¶ 41-43 (holding that Judge Stuard acted appropriately in not permitting Roberts to introduce new mitigation evidence). Accordingly, Judge Stuard's rulings in Jackson's case were not inconsistent with the court of appeals' directive and did not display bias.

{¶ 42} Third, Jackson argues that the judge exhibited bias by failing to consider his allocution before sentencing him to death. As will be discussed regarding proposition IV, the trial court erred by failing to discuss Jackson's allocution in the R.C. 2929.03(F) sentencing opinion. But that error does not prove that Judge Stuard harbored a hostile feeling or a spirit of ill will against Jackson or

his attorneys during the proceedings. Accordingly, Jackson fails to demonstrate that any omissions from the sentencing opinion resulted from judicial bias.

{¶ 43} Finally, Jackson argues that Judge Stuard's bias denied him due process in violation of the Fourteenth Amendment to the U.S. Constitution. Due process requires that a criminal defendant be tried before an impartial judge. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34. If the record evidence indicates that the trial was infected by judicial bias, the remedy is a new trial. *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 2.

{¶ 44} Again, Jackson fails to demonstrate that Judge Stuard had actual bias and acted with "ill will" or formed "a fixed anticipatory judgment" against him. *See Pratt*, 164 Ohio St. 463, 132 N.E.2d 191, at paragraph four of the syllabus; *see also Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Therefore, this claim also lacks merit.

{¶ 45} Based on the foregoing, we reject proposition III.

*B. Final, appealable order and sentencing opinion's compliance with R.C. 2929.03(F)* (Proposition of law I)

{¶ 46} Jackson argues that this court lacks jurisdiction to hear his appeal because the trial court's sentencing opinion was defective and not completed as R.C. 2929.03(F) requires. This court lacks jurisdiction over orders that are not final and appealable. *See* Ohio Constitution, Article IV, Section 3(B)(2); R.C. 2953.02.

{¶ 47} Crim.R. 32(C) prescribes the requirements for a final, appealable order in a criminal case. The rule in effect at the time of Jackson's resentencing stated:

> A judgment of conviction shall set forth the plea, the verdict, or findings, upon which each conviction is based, and the sentence. Multiple judgments of conviction may be addressed in one judgment entry. If the defendant is found not guilty or for any other reason is

entitled to be discharged, the court shall render judgment accordingly. The judge shall sign the judgment and the clerk shall enter it on the journal. A judgment is effective only when entered on the journal by the clerk.

Former Crim.R. 32(C) (2009), 122 Ohio St.3d C. Accordingly, this court has held that "a judgment of conviction is a final order subject to appeal under R.C. 2505.02 when the judgment entry sets forth (1) the fact of the conviction, (2) the sentence, (3) the judge's signature, and (4) the time stamp indicating the entry upon the journal by the clerk." *State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142, ¶ 14.

{¶ 48} As a general matter, "[o]nly one document can constitute a final appealable order," meaning that a single entry must satisfy the requirements of Crim.R. 32(C). *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163, ¶ 17. But there is an exception for capital cases, in which R.C. 2929.03(F) requires the court or panel to file a sentencing opinion. *State v. Ketterer*, 126 Ohio St.3d 448, 2010-Ohio-3831, 935 N.E.2d 9, syllabus and ¶ 17-18. In those cases, "a final, appealable order consists of both the sentencing opinion filed pursuant to R.C. 2929.03(F) and the judgment of conviction filed pursuant to Crim.R. 32(C)." *Id.* at syllabus.

{¶ 49} On August 14, 2012, the trial court issued a sentencing opinion, as R.C. 2929.03(F) requires. In the opinion, the trial court stated the jury's verdict and sentenced Jackson to death on the merged capital counts. On the same date, the trial court filed a separate judgment entry imposing sentence for the noncapital counts. On August 16, 2012, the trial court entered a nunc pro tunc entry to correct various clerical errors that were present in the judgment entry. The sentencing opinion, the judgment entry, and the nunc pro tunc entry were signed by the judge and journalized. Together, these documents comply with the requirements of

Crim.R. 32(C) and constitute a final, appealable order. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 40.

{¶ 50} Jackson argues that there is no final, appealable order because the trial court's sentencing opinion failed to comply with R.C. 2929.03(F). Jackson claims that these defects included (1) the trial judge's announcement during the sentencing hearing that he had already drafted the sentencing opinion, (2) the sentencing opinion's omission of any consideration of new mitigating evidence and of new mitigating factors that Jackson attempted to raise at the resentencing hearing, and (3) the cumulative effect of those errors.

{¶ 51} In *Thompson*, which was also a capital case, this court addressed the argument that there was no final, appealable order because the sentencing opinion contained an error. In that case, the trial court's sentencing opinion mistakenly referred to a five-year sentence on a noncapital count that the court had previously dismissed but then purportedly merged with a lower-degree felony. *Id*. at ¶ 44-45. This court in rejecting Thompson's argument that there was no final, appealable order stated, " '[S]entencing errors are not jurisdictional.' " *Id.* at ¶ 45, quoting *Manns v. Gansheimer*, 117 Ohio St.3d 251, 2008-Ohio-851, 883 N.E.2d 431, ¶ 6. "Instead, sentencing errors can be remedied on appeal in the ordinary course of law." *Thompson* at ¶ 45.

{¶ 52} Jackson's challenge to the sentencing opinion involves capital offenses rather than the noncapital offenses that were at issue in *Thompson*, but the difference in the nature of these claims makes no difference in whether there is a final, appealable order in compliance with Crim.R. 32(C). Accordingly, as in *Thompson*, we have jurisdiction over Jackson's appeal, and we reject proposition I.

*C. Exclusion of mitigating evidence on limited remand* (Proposition of law V)

{¶ 53} Jackson argues that the trial court erred by precluding the defense from presenting mitigating evidence on remand.

### 1. Facts

**{¶ 54}** Before the resentencing hearing, Jackson filed a motion to permit the defense to present additional mitigating evidence. The trial court denied that motion.

**{¶ 55}** After the motion was denied, the defense proffered three volumes of mitigating evidence. This included Ohio death-penalty statistics and information about the racial composition of juries in death-penalty cases; Jackson's school records; Jackson's criminal and probation records; psychological testing information; police reports completed following Fingerhut's murder; a psychological report, dated November 12, 2002, prepared by Dr. Sandra McPherson, who evaluated Jackson prior to the mitigation phase of his trial; affidavits from Jackson's friends and family members; documentation of medical concerns about Ohio's lethal-injection protocol; and Jackson's affidavit, dated May 20, 2004, expressing dissatisfaction about his trial counsel's representation.

### 2. Analysis

**{¶ 56}** Under the Eighth Amendment, the sentencer in a capital case may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis sic.) *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). Moreover, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence." (Emphasis sic.) *Eddings v. Oklahoma*, 455 U.S. 104, 113-114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); s*ee also Hitchcock v. Dugger*, 481 U.S. 393, 398-399, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

**{¶ 57}** In *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the court held that a capital defendant had an Eighth Amendment right to

introduce, at his sentencing hearing, "testimony * * * regarding his good behavior during the over seven months he spent in jail awaiting trial." *Id*. at 4. This was relevant "evidence in mitigation" because

> the jury could have drawn favorable inferences from this testimony regarding petitioner's character and his probable future conduct if sentenced to life in prison. * * * [T]here is no question but that such inferences would be "mitigating" in the sense that they might serve "as a basis for a sentence less than death." * * * [E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under *Eddings*, such evidence may not be excluded from the sentencer's consideration.

(Footnote omitted.) *Id*. at 4-5, quoting *Lockett* at 604.

{¶ 58} The United States Supreme Court has not determined that a capital defendant has a categorical constitutional right to introduce new mitigation evidence that is discovered after a sentencing hearing in which the defendant was given an opportunity to present all the mitigation evidence he desired. That court has also not resolved whether a remand for a limited resentencing in a capital case that effectively excludes the presentation of newly discovered mitigation evidence is constitutionally invalid. *See State v. Berget*, 2014 S.D. 61, 853 N.W.2d 45, ¶ 32.

{¶ 59} Jackson invokes *Davis v. Coyle*, 475 F.3d 761 (6th Cir.2007), in arguing that the trial court violated his constitutional rights by denying his motion to fully present mitigation at the resentencing hearing. Jackson asserts that the Eighth Amendment, as interpreted by *Lockett* and its progeny, entitled him to present the evidence on remand.

**{¶ 60}** In *State v. Davis*, 63 Ohio St.3d 44, 584 N.E.2d 1192 (1992), a three-judge panel excluded posttrial mitigation evidence during a defendant's resentencing hearing. On appeal, we held that neither *Lockett*, *Eddings*, *Skipper*, nor *Hitchcock* entitled the defendant to present the evidence on remand. *Davis* at 46. We distinguished *Skipper* by noting that it involved the erroneous exclusion of "evidence of Skipper's good prison record *between his arrest and trial*." (Emphasis sic.) *Id.*

**{¶ 61}** The United States Court of Appeals for the Sixth Circuit later addressed this issue in habeas corpus proceedings involving the *Davis* case. In *Coyle*, the Sixth Circuit held that the three-judge panel's decision to exclude posttrial mitigation evidence from Davis's resentencing hearing violated his Eighth Amendment rights. *Id.* at 773. The Sixth Circuit stated that this court's affirmance of that ruling in *Davis*, "based on the court's belief that the facts of Davis's case could be distinguished from *Skipper*'s solely on the basis of timing, was both an unreasonable application of the decision in *Skipper* and contrary to the holding in that opinion and its antecedent cases." *Id.* The *Coyle* court concluded that "the holding in *Skipper* * * * requires that, at resentencing, a trial court must consider any new evidence that the defendant has developed since the initial sentencing hearing." *Id.* at 774, citing *Skipper*, 476 U.S. at 8, 106 S.Ct. 1669, 90 L.Ed.2d 1.

**{¶ 62}** In *Roberts II*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1110, at ¶ 39, we declined to apply *Coyle* and rejected claims that the trial court's failure to admit mitigating evidence during the resentencing hearing violated Roberts's Eighth Amendment rights. As discussed earlier, this court in *Roberts I* affirmed Roberts's convictions, but we remanded for limited resentencing because the trial judge engaged in ex parte communications with the prosecutor in drafting the sentencing opinion. *Roberts I*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶ 153-164. On remand, Roberts filed a motion to introduce new mitigating

evidence, but the trial judge denied that motion and resentenced Roberts to death. *Roberts II* at ¶ 12-13.

{¶ 63} In *Roberts II*, we emphasized that *Coyle* was not binding precedent, because "we are 'not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court.' " *Roberts II* at ¶ 33, quoting *State v. Burnett*, 93 Ohio St.3d 419, 424, 755 N.E.2d 857 (2001). But we considered whether *Coyle* was persuasive and on point in the case before us. This court in *Roberts II* then distinguished *Lockett*, *Eddings*, *Skipper*, and *Hitchcock* on the grounds that none of those cases involved "a proceeding on remand for the limited purpose of correcting an error that occurred *after* the defendant had had a full, unlimited opportunity to present mitigating evidence to the sentencer." (Emphasis sic.) *Roberts II* at ¶ 34.

{¶ 64} We concluded:

> In a case in which the defendant was not deprived of any constitutional right—including her Eighth Amendment right to present mitigation—at the time of her mitigation hearing, there seems to be no basis for requiring the trial court to reopen or supplement that evidence in a later proceeding. To hold, as *Coyle* does, that a new mitigation hearing must be held, even though no constitutional error infected the original one, would transform the right to present relevant mitigation into a right to *update* one's mitigation. Such a right has no clear basis in *Lockett* or its progeny.

(Emphasis sic.) *Roberts II* at ¶ 36.

{¶ 65} Jackson argues that the opinion in *Roberts II* "failed to acknowledge that other federal courts of appeals have reached the same conclusion" that the Sixth Circuit reached in *Coyle*. But that is incorrect. The opinion in *Roberts II* cited

United States Court of Appeals decisions from the Ninth and Eleventh Circuit Courts of Appeals that were in accord with *Coyle*. *Roberts II* at ¶ 32, citing *Creech v. Arave*, 947 F.2d 873, 881-882 (9th Cir.1991) (en banc), and *Spaziano v. Singletary*, 36 F.3d 1028, 1032-1035 (11th Cir.1994). More importantly, those decisions do not change the fact that the United States Supreme Court has not ruled on this issue.

{¶ 66} Jackson also argues that like the petitioner in *Coyle*, he suffered actual prejudice by not being allowed to present information as to his exemplary behavior in prison. During allocution, Jackson stated, "I haven't been in any trouble since I have been on death row since 2007 and that was a little minor situation, but I haven't been in any trouble or anything since then. * * * I have learned to adjust to the environment without any problem." Jackson proffered no other evidence relative to his good behavior in prison.

{¶ 67} In *Coyle*, the Sixth Circuit noted that although neither side was permitted to introduce new evidence during the resentencing hearing, the state had argued to the trial court that Davis's status as a repeat offender made him too dangerous to be sentenced to anything other than death. *Coyle*, 475 F.3d at 772-773. In rebuttal, Davis relied upon evidence presented at his first sentencing hearing, but he was not allowed to present testimony about his most recent behavior and adjustment to prison life. *Id*. at 773. The court in *Coyle* held that the testimony Davis was prevented from presenting was "highly relevant" and should have been allowed. *Id*.

{¶ 68} The facts in *Coyle* are distinguishable from what occurred during Jackson's resentencing hearing. The prosecutor at that hearing made no argument in favor of the death penalty. Thus, unlike *Coyle*, Jackson had no arguments to rebut. Moreover, it is unclear what other evidence about good prison behavior (besides his statement in allocution) Jackson could have presented. Accordingly,

*Coyle* does not support Jackson's claim that his constitutional rights were violated because he was not allowed to present evidence about his prison behavior.

{¶ 69} Jackson also argues that he should have been allowed to present new mitigating evidence about his background because evidence presented during his original sentencing hearing was inaccurate. Jackson asserts that during his mitigation hearing, information was presented indicating that he was a good student, had a positive upbringing, and had average intellectual ability with an IQ score of 84. Jackson states that the court should have considered additional information during the resentencing proceedings that showed that his mother was an alcoholic, he grew up in a bad neighborhood marked by violent crime and drug addiction, he was a poor student with severe behavioral issues and borderline intelligence, and his IQ score of 84 was inaccurate.

{¶ 70} Jackson argues that mitigating evidence pertaining to his background was presented in a different light during the sentencing phase of his jury trial than that evidence should have been conveyed. Yet Jackson was given a full opportunity to present mitigating evidence during his initial sentencing hearing. Accordingly, Jackson was not entitled to improve or expand his mitigating evidence simply because the court of appeals required the judge to resentence him and prepare a new sentencing opinion. *See Roberts II*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, at ¶ 36; *State v. Chinn*, 85 Ohio St.3d 548, 564-565, 709 N.E.2d 1166 (1999). We reject this claim.

{¶ 71} In a recent decision, the South Dakota Supreme Court also held that a capital defendant does not have an Eighth Amendment right to present updated mitigation evidence on resentencing. *Berget*, 2014 S.D. 61, 853 N.W.2d 45, at ¶ 45-46. The court in *Berget* considered and compared the reasoning underlying *Coyle* and *Roberts II* and determined that *Roberts II* is the more persuasive authority. *Berget* at ¶ 38.

**{¶ 72}** As to claims similar to those raised by Jackson, the *Berget* court reasoned that recognizing a defendant's right to present updated mitigation in this situation "would establish the incentive to turn a limited resentencing into a full-fledged, second sentencing hearing by seeking out all newly discoverable mitigation evidence conceivable, again no longer making the original sentencing proceeding the ' "main event" ' but consigning it to a mere ' "tryout on the road." ' " *Id.* at ¶ 45, quoting *Gregory v. Solem*, 449 N.W.2d 827, 833 (S.D.1989), quoting *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The *Berget* court added, "It is also more than conceivable that Berget may claim new, positive relationships with family members, fellow prisoners, or strangers for the remainder of his life if this Court permits each assertion of a relationship to be grounds for a new sentencing hearing or grounds for ignoring our limited remand instructions." *Id.*

### 3. Conclusion

**{¶ 73}** No binding authority holds that the Eighth Amendment requires a resentencing judge to accept and consider new mitigation evidence at a limited resentencing when the defendant had the unrestricted opportunity to present mitigating evidence during his original mitigation hearing. Accordingly, we adhere to our precedent in *Roberts II* and reject proposition V.

### D. *Failure to discuss allocution in the sentencing opinion* (Proposition of law VI)

**{¶ 74}** Jackson argues that the trial court failed to consider his allocution in determining his sentence.

### 1. Facts

**{¶ 75}** At the resentencing hearing on August 14, 2012, the trial court asked trial counsel if they had anything further to say. Counsel indicated that Jackson wanted to make a statement. Jackson then said:

Your Honor, I would just like to say, doing my time in Trumbull Correctional, I went down there and obtained a certificate in basic skills computer class and I passed advanced class and also became a tutor down there and also got a certificate in the music program, and I was trying to get into other different programs that they have down there. I haven't been in any trouble since I have been on death row since 2007 and that was a little minor situation, but I haven't been in any trouble or anything since then, Your Honor. Since I have been off of death row, I understand a lot of things. In a different situation and different environment I was in, I have learned to adjust to the environment without any problem, Your Honor.

**{¶ 76}** The trial court stated, "I accept what you are saying" and then also afforded Jackson the opportunity to speak before pronouncing the sentence. Jackson said, "I feel that doing my time, I have learned to find myself and I know who I am right now, and * * * I wouldn't like to be placed back on death row. I really wouldn't."

**{¶ 77}** The trial court filed the sentencing opinion on the same afternoon, after the resentencing hearing concluded. The trial court stated in the sentencing opinion that it had considered "the relevant evidence raised at trial, the relevant testimony, the other evidence, the unsworn statement of the Defendant, and the arguments of counsel." The sentencing opinion did not mention Jackson's allocution.

2. Analysis

**{¶ 78}** Jackson argues that the trial court's failure to mention his allocution in its sentencing opinion shows that it was not considered.

**{¶ 79}** In *Roberts II*, the trial court did not discuss the defendant's allocution in its sentencing opinion. 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, at ¶ 52-53. In reviewing this omission, we stated in *Roberts II*:

> We have previously rejected claims that a trial court's failure to *mention* particular mitigating factors in a sentencing opinion obliges a reviewing court to infer that the trial court failed to *consider* those factors. " * * * While a sentencing court must consider all evidence of mitigation, it need not discuss each [allegedly mitigating] factor individually."

(Emphasis and words in brackets sic.) *Id*. at ¶ 54, quoting *State v. Phillips*, 74 Ohio St.3d 72, 102, 656 N.E.2d 643 (1995), citing *Parker v. Dugger*, 498 U.S. 308, 314-315, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). In *Roberts II*, we held that "the particular circumstances" of the case warranted "the inference that the trial judge did, in fact, fail to consider Roberts's allocution in sentencing her to death." *Id*. at ¶ 55.

**{¶ 80}** In *Roberts II*, allocution was "the *only* relevant matter" in mitigation that Roberts presented during her original sentencing or her resentencing. (Emphasis sic.) *Id*. at ¶ 56. Roberts had presented no mitigating evidence during her original trial. *Id*. During her allocution on resentencing, however, Roberts presented mitigating information about her childhood abuse and rape, recited her history of mental-health issues, and provided examples of her selflessness and contributions to society. The latter included her time working in a plastic surgeon's office, her treatment of wounded soldiers in Israel, and her efforts to assist the less fortunate, including making monetary donations. *Id*. at ¶ 57-61.

**{¶ 81}** In *Roberts II*, we emphasized "the presence of relevant and potentially significant mitigation in Roberts's allocution" and "the utter lack of

anything else offered for the specific purpose of mitigation." *Id*. at ¶ 64. In addition, we had specifically called the matter of allocution to the trial judge's attention in remanding the case in *Roberts I*. *See Roberts II* at ¶ 63, citing *Roberts I*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶ 166. In *Roberts II*, we stated, "Given these unusual circumstances, we are justified in drawing the inference that when the trial judge weighed the aggravating circumstances against the mitigating factors he did not consider Roberts's allocution." *Id*. at ¶ 64. We concluded that this failure violated the Eighth Amendment. *Id*. at ¶ 65, 69.

{¶ 82} In reviewing potential remedies, we acknowledged in *Roberts II* that this court's independent reweighing can sometimes rectify an error in the sentencing opinion. *Id*. at ¶ 69, citing *Phillips*, 74 Ohio St.3d at 102, 656 N.E.2d 643. Yet in *Roberts II*, we concluded that the sentencing opinion was "so inadequate as to severely handicap our ability to exercise our power of independent review," and we vacated the sentence of death. *Id*. at ¶ 72. We ordered the trial court on remand to consider the entire record again, including Roberts's allocution, to determine whether the aggravating circumstances outweigh the mitigating factors and then to write and file a sentencing opinion pursuant to R.C. 2929.03(F). *Id*. at ¶ 73.

{¶ 83} In remanding Jackson's case for resentencing, the court of appeals stated, "Based on the Supreme Court of Ohio's holding" in *Roberts I*, Jackson "is entitled to the same relief afforded to his co-defendant." 190 Ohio App.3d 319, 2010-Ohio-5054, 941 N.E.2d 1221, at ¶ 29. Jackson's remand proceedings involved the same judge, who did not mention Jackson's allocution in his resentencing opinion. Although our decision in *Roberts II* was announced more than a year after Jackson's resentencing occurred, we conclude that the trial court should have considered Jackson's allocution in the resentencing opinion.

### 3. Remedy

**{¶ 84}** We now turn to the question of how to remedy the error. We have previously stated that even if a trial court " 'should have more explicitly analyzed the mitigating evidence,' this court's independent reweighing will rectify the error." *Phillips* at 102, quoting *State v. Lott*, 51 Ohio St.3d 160, 171, 555 N.E.2d 293 (1990). In *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), we used independent review to rectify a trial court's failure to enunciate its reasoning. There, we observed that the very purpose of an independent appellate review of death sentences is, "at least in part, to correct such omissions." *Id*. at 247.

**{¶ 85}** In sharp contrast to *Roberts I*, Jackson presented extensive mitigating evidence during his original sentencing hearing. Jackson's mother and three other family members testified about his upbringing. *See* 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, at ¶ 164-167. Dr. Sandra McPherson, a clinical and forensic psychologist, provided testimony about Jackson's poor school record, parental neglect, serious behavioral problems, IQ scores, and early drug use and alcohol dependency. *Id*. at ¶ 169-175. Jackson also made an unsworn statement and apologized for what happened to the victim. *Id*. at ¶ 176.

**{¶ 86}** Unlike the situation in *Roberts II*, Jackson's allocution during his resentencing hearing added little to the mitigation that was already before the court. Jackson told the court at his resentencing hearing that he had obtained educational certificates, had served as a tutor, and had not been in any serious trouble either on or off death row. Jackson claims that the court's failure to consider his good prison behavior was especially prejudicial. Evidence had established, however, that Jackson and Roberts planned Fingerhut's death while Jackson was in prison earlier. Under these circumstances, it is doubtful that Jackson's claim about his adaptation to prison life could have carried much weight. We hold that any omissions in the sentencing opinion were harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

{¶ 87} Based on the foregoing, we decline to remand this case for a new sentencing opinion. Instead, we shall cure any error in the sentencing opinion during our independent evaluation of Jackson's capital sentence.

*E. Prosecutorial taint of the sentencing opinion* (Proposition of law VII)

{¶ 88} Jackson argues that the similarities between the 2002 and 2012 sentencing opinions show that the 2012 sentencing opinion remains "tainted" by the prosecutor's involvement. He contends, therefore, that the case should be remanded to the trial court to write an entirely new sentencing opinion.

1. Facts

{¶ 89} On December 9, 2002, Judge Stuard filed a death-penalty sentencing opinion following Jackson's trial. The Eleventh District later ordered the trial court to "personally review and evaluate the appropriateness of the death penalty" and "prepare an entirely new sentencing entry as required by R.C. 2929.03(F)." 190 Ohio App.3d 319, 2010-Ohio-5054, 941 N.E.2d 1221, at ¶ 29.

{¶ 90} On August 14, 2012, Judge Stuard filed a new sentencing opinion after resentencing Jackson to death. In that opinion, Judge Stuard stated:

This writer has presided over the trial of each of the Co-Defendants, Nathaniel Jackson and Donna Roberts. He has reviewed and decided the appropriateness of the death penalty option in both cases as required by O.R.C. 2929.03 and now does so again as ordered by the Ohio Supreme Court.

{¶ 91} The 2002 and 2012 sentencing opinions are very similar. The 2002 sentencing opinion summarized the trial-phase evidence, discussed the aggravating circumstances and mitigating evidence, and explained why the trial court concluded that "the aggravating circumstances, outweighed, by proof beyond a reasonable doubt, the collective mitigating factors." The 2012 sentencing opinion added three

new introductory paragraphs explaining the reasons for Jackson's resentencing proceedings. Two other paragraphs were rewritten to discuss the trial-phase evidence in a different way. Otherwise, the two opinions are almost identical.

2. Analysis

**{¶ 92}** Jackson argues that Judge Stuard's failure to write an entirely new sentencing opinion shows that the 2012 opinion remains impermissibly tainted by the prosecutor's earlier involvement. He asserts that a few cosmetic changes from the old to the new sentencing opinion did not remove that taint.

**{¶ 93}** In his 2012 sentencing opinion, Judge Stuard acknowledged his responsibility to review and decide the appropriateness of the death penalty anew. Nothing in the remand directed Judge Stuard to totally deconstruct the sentencing opinion in preparing a new one. Moreover, Judge Stuard had before him the same mitigating evidence, except for the information conveyed in Jackson's 2012 allocution, in 2002 and 2012. This helps explain the similarities between the two opinions.

**{¶ 94}** Jackson presents no additional evidence showing that prosecutorial taint from the 2002 sentencing opinion carried over to the 2012 sentencing opinion. Indeed, during oral argument, Jackson's counsel acknowledged that the prosecutor was not involved in writing the new sentencing opinion. Accordingly, Jackson has failed to overcome the presumption that the judge was "capable of separating what may properly be considered from what may not be considered" and followed the law. *In re Disqualification of Forsthoefel*, 135 Ohio St.3d 1316, 2013-Ohio-2292, 989 N.E.2d 62, ¶ 9, citing *In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, 798 N.E.2d 23, ¶ 5. Under these circumstances, it is unnecessary for the trial court to prepare a third sentencing opinion because of similarities in wording between the second and first sentencing opinions.

**{¶ 95}** Based on the foregoing, we reject proposition VII.

*F. Failure to have two appointed attorneys at the resentencing hearing*

(Proposition of law IV)

**{¶ 96}** Jackson argues that the trail court's failure to ensure that two appointed attorneys represented him at his resentencing hearing violated his rights to effective assistance of counsel and due process.

**{¶ 97}** To establish ineffective assistance of counsel, Jackson must show that his trial counsel's performance was both deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). With respect to deficiency, Jackson must show that his counsel's performance "fell below an objective standard of reasonableness." *Strickland* at 688. With respect to prejudice, Jackson must show that there is a reasonable probability that but for his counsel's unprofessional errors, the outcome of the proceeding would have been different. *Id*. at 694.

1. Facts

**{¶ 98}** On August 1, 2012, Randall Porter, an assistant state public defender, submitted a motion requesting the trial court to appoint two attorneys, including himself, for resentencing purposes. He also filed a motion for a continuance. Porter stated that he was familiar with the record and had represented Jackson for eight years. Porter stated that attorney John Parker had been serving as "volunteer counsel" for Jackson for the previous five years, but Porter also stated that Parker could not accept an appointment because Parker had been appointed to represent Jackson in his federal habeas proceedings. On August 13, the trial court denied the motion for a continuance.

**{¶ 99}** At the resentencing hearing on August 14, Porter and Parker appeared before the court. As a preliminary matter, Porter stated that Jackson "today is technically here without appointed counsel. I'm not appointed for this matter." The trial court responded:

We are not here because of pending charges against Mr. Jackson. We are here solely as a result of the appeal that was filed from the original trial. Therefore, it appears to me that you are the appropriate counsel. This Court need not reappoint you. You are merely handling the appeal process for Mr. Jackson. Otherwise we wouldn't be here.

{¶ 100} Parker then told the court that he had "never been appointed in state court to represent Mr. Jackson." Parker stated, "I have only been appointed to represent him on that federal [habeas] petition." Parker added, "I am here as a courtesy to the Court because I received notice to be here, and I have been involved in Mr. Jackson's case, as a courtesy to Mr. Jackson and the Ohio Public Defender's Office."

{¶ 101} Parker also told the court that he was concerned that there was a conflict between his representation of Jackson in this case and in the federal habeas case. The trial court responded, "That is something I need not determine. That is up to you, whatever you are comfortable with." After some additional discussion, the trial court added, "[It] is up to Mr. Parker. If he feels there is some conflict, I am not going to insist that he proceed at this time." Porter and Parker remained in the courtroom, but only Porter spoke during the remainder of the resentencing hearing.

2. Analysis

*a. Conflict of interest*

{¶ 102} Jackson argues that Parker could not represent him during the resentencing proceedings due to a potential conflict of interest. In order to satisfy a Sixth Amendment claim of ineffective assistance of counsel, Jackson must demonstrate that an actual conflict of interest adversely affected his counsel's actual

performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *State v. Manross*, 40 Ohio St.3d 180, 182, 532 N.E.2d 735 (1988). Jackson invokes *Martinez v. Ryan*, 566 U.S.__, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), in arguing that Parker's "potential conflict" disqualified him from representing Jackson during the resentencing proceedings.

{¶ 103} In *Martinez*, 566 U.S. __, 132 S.Ct. at 1315, the United States Supreme Court recognized a "narrow exception" to the rule established in *Coleman v. Thompson*, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), that defendants possess no federal constitutional right to the effective assistance of counsel in postconviction proceedings. The court in *Martinez* held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez,* 566 U.S. __, 132 S.Ct. at 1320.

{¶ 104} *Martinez* is directed toward federal habeas proceedings and is intended to address issues that arise in that context. *Howell v. State*, 109 So.3d 763, 774 (Fla.2013). Similarly, Jackson's arguments regarding the alleged "conflict of interest" are primarily directed toward future federal proceedings and the possibility of raising ineffectiveness claims based on *Martinez* in that forum. *See Howell* at 773. But Jackson does not demonstrate that any actual conflict existed at the time of the resentencing hearing.

{¶ 105} Moreover, Jackson does not state with any particularity what adverse effect the claimed conflict had upon his counsel's performance. He has not

cited any specific claims that Parker failed to assert at his resentencing proceeding due to a conflict of interest. Therefore, we reject this aspect of Jackson's argument.

*b. Appointment of counsel*

{¶ 106} At the time of Jackson's resentencing, former Sup.R. 20(II)(A) required that at least two capitally certified trial attorneys "shall be appointed by the court to represent an indigent defendant" in capital cases. Former Sup.R. 20(II)(B) required that at least two capitally certified appellate attorneys "shall be appointed by the court to appeal cases where the trial court has imposed the death penalty on an indigent defendant."[1]

{¶ 107} The trial court did not appoint Porter or Parker as counsel for Jackson due to the court's belief that Jackson's resentencing was a continuation of the appellate proceedings that led to the remand. This belief was incorrect. Former Sup.R. 20 had separate requirements for the appointment of counsel during trial and appellate proceedings in capital cases. Moreover, when a case is remanded for resentencing, the trial court "must approach resentencing as an independent proceeding complete with all applicable procedures." *State v. Gray*, 8th Dist. Cuyahoga No. 81474, 2003-Ohio-436, ¶ 12; *State v. Aliane*, 10th Dist. Franklin No. 03AP-840, 2004-Ohio-3730, ¶ 11. Accordingly, the trial court erred in concluding that Jackson was not entitled to the appointment of counsel for purposes of the resentencing proceedings.

{¶ 108} The state argues that the defense requests for appointment of counsel and a continuance were last-minute delaying tactics because the requests were not made until 13 days before resentencing. The state argues, therefore, that

---

[1] The provisions governing the appointment of counsel that were formerly contained in Sup.R. 20(II)(A) and (B) are now in the Rules for the Appointment of Counsel in Capital Cases, as Appt.Coun.R. 5.02(A) and 5.03(A), effective February 1, 2015. *See* 141 Ohio St.3d CLXXXIII-CLXXXIV. The former rules have been revised, but the language quoted here from the former rules is substantially similar to the corresponding current provisions in Appt.Coun.R. 5.02(A) and 5.03(A).

if the trial court erred, defense counsel invited it. Under the invited-error doctrine, "a party is not entitled to take advantage of an error that he himself invited or induced the court to make." *State ex rel. Kline v. Carroll*, 96 Ohio St.3d 404, 2002-Ohio-4849, 775 N.E.2d 517, ¶ 27, citing *Lester v. Leuck*, 142 Ohio St. 91, 50 N.E.2d 145 (1943), paragraph one of the syllabus. The state's reliance on invited error is misplaced, because Jackson was entitled to be represented by two appointed counsel.

### c. Lack of prejudice

{¶ 109} The state argues that Jackson was not prejudiced because Porter and Parker were capitally certified counsel, Parker never formally withdrew from representing Jackson prior to the resentencing hearing and was present at the hearing, and Jackson received appropriate representation up to and during the resentencing hearing. Porter and Parker had represented Jackson on numerous motions, appeals, and other matters related to these offenses. Porter had represented him for eight years, and Parker had represented him since April 2007. The matters in which they had jointly represented Jackson included filing the motion for a new trial or a new sentencing hearing, filing the second application requesting that Chief Justice Moyer disqualify Judge Stuard, filing a complaint for writs of mandamus and procedendo in this court, and filing memoranda opposing the state's motion to set a date for Jackson's resentencing hearing. They also represented Jackson on the appeal to the Eleventh District that resulted in his resentencing. *See* the attorneys listed at the start of 190 Ohio App.3d 319, 2010-Ohio-5054, 941 N.E.2d 1221.

{¶ 110} During the resentencing hearing, Porter proffered three volumes of mitigating information into the record, argued that the capital specifications should be merged, informed the court that Jackson would like to make a statement before being sentenced, and asked the trial court to waive costs because of Jackson's indigency.

**{¶ 111}** In sum, Jackson was represented at the resentencing proceedings by the same counsel who had represented him for the previous several years. Porter and Parker were eminently familiar with Jackson's case, Porter actively engaged in multiple discussions with the trial court and the prosecution, Parker spoke to the trial court and was present in the courtroom, and the record shows that Jackson was capably represented during the resentencing hearing. Under these circumstances, Jackson was not prejudiced or otherwise denied due process. We reject proposition IV.

### G. *Ineffective assistance of counsel* (Proposition of law II)

**{¶ 112}** Jackson argues that he was denied effective assistance of counsel because of the last-minute substitution of new counsel for co-counsel during his 2002 mitigation hearing. As discussed regarding proposition of law IV, both deficient performance and prejudice are required to justify reversal based on ineffective assistance of counsel. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

### 1. Facts

**{¶ 113}** During the 2002 trial proceedings that ended with the jury finding Jackson guilty, Jackson had been represented by lead counsel, Anthony Consoldane, and co-counsel, James Lewis. Before the start of mitigation proceedings on November 14, 2002, and out of the jury's presence, the trial court mentioned that Lewis had been in the hospital and stated, "He's back home now, but because he's medicated, does not feel it would be appropriate to appear on the defense team today."

**{¶ 114}** The trial court asked Consoldane if the defense wanted a continuance. Consoldane replied, "I have talked with Mr. Jackson and we do not think that any delay at this point would be wise." Consoldane asked the court to allow attorney Thomas Wright to sit as co-counsel in Lewis's absence. Consoldane stated that Wright had completed the standard three-day death-penalty seminar but

was not certified and had not applied for certification. The trial court then addressed Jackson:

> THE COURT: Mr. Jackson, are you in agreement with proceeding without Mr. Lewis being here and having Mr. Wright and Mr. Consoldane?
>
> THE DEFENDANT: Yes, Sir, Your Honor.
>
> THE COURT: [You] understand that I would consider a continuance until probably Monday, if you wished.
>
> THE DEFENDANT: Yes, Sir.
>
> THE COURT: You have talked with your attorney and have agreed with him that it is in your best interest to go forward today?
>
> THE DEFENDANT: Yes, Sir, Your Honor.

The prosecutor then stated that the state would not object if the defense wanted a continuance.

{¶ 115} Following this questioning, the trial court allowed Wright to serve as co-counsel for this part of the proceeding. Wright participated briefly during the hearing, arguing that Dr. McPherson, the defense psychologist, should be allowed to sit at defense counsel's table while other witnesses testified during the mitigation hearing. Lewis returned as co-counsel at the next hearing, which was held on November 26, 2002.

{¶ 116} On his direct appeal to this court, Jackson did not raise an ineffectiveness claim based on Wright's representation as substitute co-counsel. But in his initial petition for postconviction relief, he did raise an ineffectiveness claim as to Wright's representation, arguing that Wright was not capitally certified and was new to the case. *See State v. Jackson*, 11th Dist. Trumbull No. 2004-T-0089, 2006-Ohio-2651, ¶ 139-141. The trial court rejected that claim, and the court

of appeals agreed, stating that "none of the exhibits presented by appellant in support of this claim demonstrate that Attorney Wright was ineffective." *Id*. at ¶ 140. The court of appeals also noted that Jackson had rejected an offer to delay the proceedings and had said that he wanted to proceed with attorney Wright. *Id*. The court of appeals affirmed the trial court's denial of Jackson's petition, and this court denied review. 111 Ohio St.3d 1469, 2006-Ohio-5625, 855 N.E.2d 1258.

### 2. Analysis

#### a. Jackson's claims

{¶ 117} Jackson is not challenging his counsel's performance at the 2012 resentencing hearing. Instead, he claims that he was denied the effective assistance of counsel by the substitution of co-counsel during his 2002 mitigation hearing. Jackson links the substitution of co-counsel to trial counsel's deficient performance at the 2002 hearing in the following respects: (1) attorney Wright was not qualified and lacked any knowledge of Jackson's case, (2) counsel failed to conduct a reasonable sentencing investigation, (3) attorney Consoldane failed to request a continuance to permit an adequate investigation, (4) counsel failed to retain a competent expert because Dr. McPherson's investigation and performance were deficient, and (5) counsel failed to lodge timely objections during the mitigation hearing.

#### b. Res judicata

{¶ 118} Jackson's ineffectiveness claims relating to substitute counsel, trial counsel's failure to request a continuance, and counsel's failure to lodge objections during the mitigation hearing are barred by res judicata. These claims are based entirely on the 2002 hearing. He had different appellate counsel assigned to represent him on his direct appeal. Thus, he could have, and should have, challenged Wright's representation and raised these other claims on direct appeal. *State v. Szefcyk*, 77 Ohio St.3d 93, 671 N.E.2d 233 (1996), syllabus (res judicata bars a defendant from raising and litigating any defense or any claimed lack of due

process that was raised or could have been raised by the defendant at the trial or on a direct appeal).

**{¶ 119}** In his initial petition for postconviction relief, Jackson also raised many of the ineffectiveness claims that he raises now. He challenged Wright's substitution as co-counsel and argued that Wright was new to the case and unprepared. 11th Dist. Trumbull No. 2004-T-0089, 2006-Ohio-2651, at ¶ 139. The court rejected that claim. *Id*. at ¶ 140. He also challenged the adequacy of the mitigation investigation and Dr. McPherson's competency as an expert. *Id*. at ¶ 102-103, 127-129, 142. He supported these claims with evidence outside the record, including affidavits and other materials. *Id*. at ¶ 78-79, 143-145. The court rejected these claims. *Id*. at ¶ 103, 146. Thus, these related claims are also barred by res judicata. *Szefcyk* at 95.

**{¶ 120}** Jackson argues that previous appellate decisions have ceased to have "any vitality," because his death sentence was vacated. This contention is incorrect. His present appeal, like the appeal in *Roberts II*, involves a proceeding on remand for the limited purpose of correcting an error that occurred after the jury's sentencing verdict. Accordingly, any previous issues of this type that were raised or could have been raised during his prior appeals are outside the scope of the remand and further review of them is precluded under the principles of res judicata. *See Roberts II*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1110, at ¶ 95; *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, at ¶ 33.

*c. Invited error*

**{¶ 121}** The state argues that Jackson's claim can also be rejected based on the invited-error doctrine. As discussed regarding proposition IV, a party is not entitled to take advantage of an error that he himself invited or induced the trial court to make. *Kline*, 96 Ohio St.3d 404, 2002-Ohio-4849, 775 N.E.2d 517, at ¶ 27.

**{¶ 122}** Jackson told the trial court during questioning at his 2002 trial that he agreed to proceed with replacement co-counsel during the mitigation hearing. He acknowledged that he had talked with counsel and agreed that it was in his best interest to proceed with the mitigation hearing that day. This court has found invited error when a party asked a trial court to take some action later claimed to be erroneous or affirmatively consented to a procedure that the trial court proposed. *See State v. Campbell*, 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000). Here, Jackson affirmatively consented to replacement counsel. Thus, the invited-error doctrine applies.

**{¶ 123}** Jackson argues that he lacked the ability to intelligently determine the need for a continuance and accept a replacement attorney. He bases this argument on evidence that his IQ scores were determined to be in the low 70s in the seventh and tenth grades and that he received an IQ score of 75 during postconviction testing. But Dr. McPherson during the 2002 mitigation hearing acknowledged the low IQ scores that Jackson had received in school, and she testified that although he had learning disabilities that prevented him from doing well in school, she believed that those earlier tests were not accurate and that he had "average ability." Given Dr. McPherson's testimony, there is no merit to Jackson's argument seeking to avoid application of the invited-error doctrine.

**{¶ 124}** Based on the foregoing, we reject proposition II.

*H. Merger* (Proposition of law VIII)

**{¶ 125}** Jackson argues that the trial court erred by failing to merge (1) the aggravated-burglary and aggravated-robbery aggravating circumstances, (2) the separate aggravated-burglary and aggravated-robbery offenses, and (3) the aggravated-robbery and aggravated-burglary aggravating circumstances with the corresponding felony offenses.

**{¶ 126}** Prior to sentencing in 2002, the state elected to proceed on Count One (aggravated murder with prior calculation and design) with the accompanying

aggravated-burglary and aggravated-robbery aggravating circumstances. R.C. 2929.04(A)(7). Jackson therefore was not sentenced on Count Two. At the resentencing hearing, the trial court overruled a defense motion to merge the aggravating circumstances. There were also separate counts of aggravated burglary (Count Three) and aggravated robbery (Count Four).

{¶ 127} Jackson cites *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, in arguing that the aggravated-burglary and aggravated-robbery aggravating circumstances were one act for the purposes of the merger doctrine. The lead opinion in *Johnson* stated that R.C. 2941.25(A) requires the sentencing court to first determine "whether it is possible to commit one offense *and* commit the other with the same conduct." (Emphasis sic.) *Id*. at ¶ 48. If the defendant's conduct constituting commission of one offense constitutes commission of the other, then the offenses are of similar import. *Id*. The court must then determine whether the offenses were committed by the same conduct. *Id*. at ¶ 49. "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged." *Id*. at ¶ 50. More recent decisions of this court, including the decision in *State v. Ruff*, 143 Ohio St.3d 114, 205-Ohio-995, 34 N.E.3d 892, "have rendered the analysis of the *Johnson* lead opinion largely obsolete." *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 11.

{¶ 128} This court in *Ruff* applied a three-part test under R.C. 2941.25 to determine whether a defendant can be convicted of multiple offenses:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and

(3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Id.* at ¶ 31*; see also id*. at paragraphs one, two, and three of the syllabus. Moreover, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id*. at ¶ 26.

{¶ 129} The aggravated-burglary and aggravated-robbery specifications were not subject to merger. They were dissimilar in import and committed with a separate animus. The burglary was complete when Jackson entered Fingerhut's residence with the intent to commit murder, theft, or kidnapping. Jackson committed aggravated robbery when he stole Fingerhut's car after murdering him. Thus, the aggravated burglary and aggravated robbery were separate offenses, because they did not arise from the same act. *See State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 128; *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 68.

{¶ 130} For the same reasons, we reject Jackson's argument that the separate offenses of aggravated burglary (Count Three) and aggravated robbery (Count Four) should be merged.

{¶ 131} Finally, Jackson argues that the R.C. 2929.04(A)(7) felony-murder aggravating circumstances (Count One, Specifications 1 and 2) should have been merged with the corresponding underlying felony (Counts Three and Four). This argument relies too heavily on *Johnson* and is without merit. *See State v. Keene*, 81 Ohio St.3d 646, 668, 693 N.E.2d 246 (1998) ("felony-murder under R.C. 2903.01(B) is not an allied offense of similar import to the underlying felony").

{¶ 132} Based on the foregoing, we reject proposition VIII.

*I. Lethal injection* (Proposition of law X)

{¶ 133} Jackson argues that his death penalty is invalid under the Eighth and Fourteenth Amendments because the state is unable to carry out his execution in a constitutional manner. The state argues that Jackson waived this claim when he failed to object to the constitutionality of lethal injection before the trial court. We agree that he waived or forfeited his right to challenge the constitutionality of his method of execution. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 377.

{¶ 134} Nonetheless, a forfeited claim will still be considered under plain-error analysis. *Id.* at ¶ 378. A party claiming plain error must show (1) that an error occurred, (2) that the error was obvious, and (3) that the error affected the outcome of the trial. *See State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002); Crim.R. 52(B). Moreover, the burden of demonstrating plain error is on the party asserting it. *See, e.g., State v. Jester*, 32 Ohio St.3d 147, 150, 512 N.E.2d 962 (1987).

{¶ 135} No plain error occurred. As to his Eighth Amendment claim, Jackson argues that his execution by lethal injection creates a substantial risk of serious physical pain and that the state's execution policy will require the repeated application of the execution drugs. But to support these claims, Jackson would have to rely on proof outside the record. Likewise, he would need evidence outside the record "to identify a known and available alternative method of execution that entails a lesser risk of pain, a requirement of all Eighth Amendment method-of-execution claims." *Glossip v. Gross*, 576 U.S. __, 135 S.Ct. 2726, 2731, 192 L.Ed.2d 761 (2015). Therefore, Jackson's argument is not "appropriately considered on a direct appeal." *State v. Madrigal*, 87 Ohio St.3d 378, 391, 721 N.E.2d 52 (2000) (because proof outside the record was needed to establish ineffective assistance of counsel, the claim was not appropriate on direct appeal).

**{¶ 136}** Jackson also argues that Ohio law does not afford equal protection with respect to the requirement that lethal-injection will "quickly and painlessly cause death." R.C. 2949.22(A). He asserts that the state has a pattern and practice of noncompliance with R.C. 2949.22(A) and that its written execution policy arbitrarily or intentionally treats each condemned inmate differently. He states that "[a]dditional factual development will further demonstrate" these claims. But as previously mentioned, proof outside the record cannot be considered on direct appeal. *Madrigal* at 391.

**{¶ 137}** Based on the foregoing, we reject proposition X.

*J. Constitutionality* (Proposition of law XI)

**{¶ 138}** Jackson challenges the constitutionality of Ohio's death-penalty statutes and claims that the statutes violate international law and treaties to which the United States is a party. These claims can be summarily rejected. *See State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 215-216.

*K. Cumulative error* (Proposition of law XII)

**{¶ 139}** Jackson argues that this court should vacate his sentence on grounds of cumulative error. The cumulative-error doctrine provides that "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

**{¶ 140}** Jackson cannot point to multiple instances of error. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). Nor does he demonstrate that the alleged errors collectively deprived him of a fair trial. Accordingly, proposition XII fails.

*L. Reliability of the death sentence* (Proposition of law IX)

**{¶ 141}** Jackson argues that the sentencing process was unreliable and the death sentence inappropriate. Jackson's argument here reasserts allegations of procedural irregularities and factual inaccuracies raised in other propositions of law. As previously discussed, none of those claims go to matters that constituted prejudicial error.

**{¶ 142}** This proposition additionally invokes R.C. 2929.05(A), which requires this court to review Jackson's death sentence for appropriateness and proportionality. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 188. In conducting this review, we must determine whether the evidence supports the jury's finding of the aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether Jackson's death sentence is proportionate to those imposed in similar circumstances.

## IV. Independent Sentence Evaluation

### A. Aggravating circumstances

**{¶ 143}** The two aggravating circumstances in this case were murder during aggravated burglary and murder during aggravated robbery. R.C. 2929.04(A)(7). As to these aggravating circumstances, this court has already determined that "the evidence proves beyond a reasonable doubt the aggravating circumstances in this case: that Nathaniel Jackson murdered Robert Fingerhut while committing aggravated burglary and aggravated robbery." 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, at ¶ 162.

### B. Mitigating factors

#### 1. Mitigation hearing

**{¶ 144}** During the 2002 mitigation hearing, Jackson presented five witnesses and made an unsworn statement. We previously considered this evidence in Jackson's first appeal to this court. Nevertheless, in the interest of a thorough review of the mitigating factors, we now review the mitigating evidence presented

during Jackson's mitigation hearing and the statements he made during the resentencing hearing.

{¶ 145} Raymond Dickerson, Jackson's stepfather, has known Jackson since Jackson was 15 years old. He testified that Jackson has been respectful to him and to Jackson's mother and grandmother. Dickerson stated that he has not seen much of Jackson after Jackson turned 17 years old.

{¶ 146} Taushia Korneagay, Jackson's younger sister, testified that Jackson is "really kind" and "helped out a lot" with her four children. She described Jackson as a "very smart" person. She also said that she wanted the jury to spare his life.

{¶ 147} Lorraine Rue, the mother of Jackson's daughter, Shaylese, and Shaylese herself, who was in the second grade, appeared on the witness stand together. Shaylese stated that Jackson had brought her toys and that she would like to keep seeing him.

{¶ 148} Pauline Korneagay, Jackson's mother, briefly described Jackson's upbringing. She stated that Jackson did "pretty good" in school but later quit. Thereafter, Jackson lived with her and his grandmother at his grandmother's house. Korneagay stated that they did not live in a "rough" neighborhood. When questioned, she said that she did not remember Jackson "being shot" when he was still attending school or that she had written a letter to the school to excuse him for that reason. Korneagay said that she keeps in touch with Jackson and would continue to visit him in prison.

{¶ 149} Dr. McPherson was the defense's primary mitigation witness. Dr. McPherson interviewed Jackson, talked to his family members, reviewed his school and other records, and submitted a report on her findings. She testified that Jackson was raised by his mother and his maternal grandmother. But Jackson had little, if any, real contact with his father.

{¶ 150} Dr. McPherson testified that Jackson had "fairly serious" behavior problems in school. By the third grade, Jackson had already been suspended from

school. According to Dr. McPherson, Jackson suffered from an attention-deficit hyperactivity disorder ("ADHD") characterized by impulsiveness and an inability to stop his behavior. She added that Jackson did not get into any kind of structured program to treat his ADHD until he was in the eighth grade. Jackson did "fairly well" in that program, and that was the only time that Jackson recalled liking school. He dropped out of school in the 11th grade.

{¶ 151} Jackson began using alcohol and drugs early in life. He started using marijuana when he was 13 years old and rapidly became dependent on it. Jackson also used cocaine to some degree, though he never used other serious drugs. Dr. McPherson testified that Jackson was repeatedly involved in nonviolent crimes as an adult and that these were mostly related to his drug habit.

{¶ 152} Dr. McPherson stated that Jackson's longest period of work "was about six months, maybe less." Jackson lived on his own as an adult and "basically survive[d] on the streets." During the ensuing ten years or so after he reached adulthood, Jackson was "shot at least four or five times." Dr. McPherson testified that her investigation revealed that before Jackson dropped out of school, Jackson's mother had sent a note to the school asking for him to be excused from attending one day because two people had been shooting at him and he had to make a police report.

{¶ 153} Jackson has fathered two children but has never been in a position to assume much parental responsibility. One of the children has cerebral palsy, and the mother's family has not allowed him to have contact with that child.

{¶ 154} Dr. McPherson's testing showed that Jackson has a full-scale IQ score of 84. She stated that IQ testing in the seventh and tenth grades had indicated that Jackson was "at or around the 70 level." Dr. McPherson attributed the difference in scores to the fact that Jackson had not been attentive and was not motivated to cooperate when he took the tests in school and that he did better when tested in a more structured prison environment. She added that "based partly on

the sub test and partly on what we know about the test bias, he's an African American who has not had a good education, the test is biased against him. The chances are he's of average ability, and under the right circumstances could have been quite reasonably successful in life."

{¶ 155} Dr. McPherson diagnosed Jackson with an antisocial personality disorder. But she added that Jackson "has shown the capacity to be loyal within his own group" and "does not mirror the diagnosis of an individual who is incapable of relating to people." Jackson retains a loyalty and love for his family. In addition, Dr. McPherson believed that he would function best in the structured setting of a prison environment.

{¶ 156} Dr. McPherson stated that Jackson's relationship with Roberts "was clearly a very destructive relationship." Jackson received reassurance in this relationship, and he felt like he was "somebody special." Dr. McPherson also stated that Jackson felt like he would be more stable with Roberts, because "[s]he had a job, she had an adequate living situation, certainly more adequate then he had ever experienced."

{¶ 157} Jackson made an unsworn statement during the 2002 mitigation hearing. He stated:

I would like to apologize for what happened to the victim. I am very sorry for what happened and I know by me saying sorry ain't going to bring his life back. This is something I have to live with for the rest of my life, and also like for my daughter, to know that she still has a father that is alive and I would like to see her grow up.

{¶ 158} Jackson also made a statement in allocution prior to sentencing in 2002, stating, "I'd just like for the Court to spare me my life. I'm sorry for what happened, happened. I never meant for it to happen."

2. Resentencing hearing

{¶ 159} Before the trial court resentenced him, Jackson told the court that while at Trumbull Correctional Institution, he obtained a certificate in the basic-skills computer class, passed an advanced class, received a certificate in the music program, and become a tutor. He also told the court that he had not been in any trouble "since I have been on death row since 2007." He said that the trouble was "a little minor situation" and that he had not "been in any trouble or anything since then." He also said, "Since I have been off of death row, I understand a lot of things." That includes adjusting to a different situation and environment without any problems.

{¶ 160} Jackson also made a second statement before the sentence was announced: "I feel that doing my time, I have learned to find myself and I know who I am right now, and I * * * wouldn't like to be placed back on death row. I really wouldn't."

*C. Sentence evaluation*

{¶ 161} Nothing in the nature and circumstances of the offense is mitigating. It is evident from their correspondence and phone calls that Jackson and Roberts planned to kill Fingerhut when Jackson was released from prison. Jackson assured Roberts that the murder was something that they had to do and that he had it all figured out. They planned to collect the insurance proceeds that Roberts would receive following Fingerhut's death and then live together. And after he was released from prison, Jackson murdered Fingerhut in Fingerhut's home and then fled the scene in Fingerhut's car.

{¶ 162} Jackson's history, character, and background provide some details of mitigating value. Jackson's father was never part of his life, and Jackson had

behavioral problems in school, mostly because of his ADHD. He dropped out of school in the 11th grade. Although his mother denied that Jackson was raised in a rough neighborhood, Dr. McPherson's testimony showed otherwise. Jackson had a history of drug and alcohol dependency that began when he was 13 years old. Jackson also told the court during the resentencing hearing that he had obtained certificates in computer skills and in the music program while in prison.

{¶ 163} The statutory mitigating factors under R.C. 2929.04(B) include R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect); (B)(4) (youth of the offender); (B)(5) (lack of a significant criminal record); (B)(6) (accomplice only); and (B)(7) (any other relevant factors). The factors under R.C. 2929.04(B)(1), (B)(2), (B)(3), (B)(4), (B)(5), and (B)(6) do not appear to be applicable.

{¶ 164} As to the other relevant mitigating factors under R.C. 2929.04(B)(7), we give some weight in mitigation to Jackson's ADHD and antisocial personality disorder. Although Jackson disputes the reliability of the testing, Dr. McPherson testified that Jackson has a "full-scale IQ of 84" and that the "chances are he's of average ability." We also give some weight to the testimony that Jackson had a troubled childhood as a R.C. 2929.04(B)(7) factor. *But see Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 265 (unstable childhood seldom given "decisive weight" as a mitigating factor). And we give weight to Jackson's history of drug and alcohol abuse. *See State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 158. In addition, we give some weight to testimony that Jackson has the love and support of his family and cares about his daughter. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 338.

{¶ 165} During the resentencing hearing, Jackson raised his ability to adapt well to prison life. Dr. McPherson had testified during his 2002 mitigation hearing that Jackson tended to do better in structured settings and that prison was a positive

environment for him. Jackson also stated at the resentencing hearing that he had not been in any trouble in prison since 2007 and called that a "minor situation." Good behavior in prison is relevant to the lack of future dangerousness. *See State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 303. Yet Jackson and Roberts planned Fingerhut's murder when Jackson was previously in prison. Thus, we give little mitigating weight to this testimony.

{¶ 166} Finally, we give some mitigating weight to Jackson's expressions of remorse during his unsworn statement in 2002 "for what happened to the victim." *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 327.

{¶ 167} Upon independent weighing, we find that each aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. The letters and phone conversations between Jackson and Roberts show that they planned Fingerhut's murder over the course of several months. After he was released from prison, Jackson murdered Fingerhut during a burglary and stole his car. Jackson's mitigating evidence has little significance in comparison.

{¶ 168} As a final matter, we must determine "whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). "The proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), paragraph one of the syllabus. *But see State v. Murphy*, 91 Ohio St.3d 516, 562, 747 N.E.2d 765 (2001) (Pfeifer, J., dissenting) (proportionality review should include factually similar cases in which a death sentence was not imposed).

{¶ 169} We find that the death penalty is both appropriate and proportionate when compared with capital cases involving aggravated murder during an aggravated burglary, *see State v. Davie*, 80 Ohio St.3d 311, 686 N.E.2d 245 (1997); *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, and aggravated murder during an aggravated robbery, *see State v. Burke*, 73 Ohio St.3d

399, 653 N.E.2d 242 (1995); *State v. Raglin*, 83 Ohio St.3d 253, 699 N.E.2d 482 (1998).

{¶ 170} We therefore affirm the convictions and sentences, including the death sentence.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, FRENCH, and KLATT, JJ., concur.

O'DONNELL, J., concurs in part and concurs in judgment, with an opinion.

LANZINGER, J., dissents, with an opinion.

WILLIAM A. KLATT, of the Tenth District Court of Appeals, sitting for O'NEILL, J.

_____

**O'DONNELL, J., concurring in part and concurring in judgment.**

{¶ 171} I concur with the decision of the majority to affirm the sentences imposed on Nathaniel Jackson, including the death sentence; in my view however, contrary to the majority, the trial court did not err by failing to mention Jackson's allocution in its resentencing opinion, making it unnecessary for this court to consider whether that failure is harmless error because the matter is resolved through our independent sentence evaluation.

{¶ 172} This court has previously held that in considering mitigating factors in a capital-offense sentencing opinion, the failure of the trial court to incorporate and discuss all of the mitigating factors in its opinion is not reversible error. *See State v. Obermiller*, ___ Ohio St.3d ___, 2016-Ohio-1594, ___ N.E.3d ___, ¶ 125-126; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 362-363. "While a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually." *State v. Phillips*, 74 Ohio St.3d 72, 102, 656 N.E.2d 643 (1995), citing *Parker v. Dugger*, 498 U.S. 308, 314-315, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). "And a trial court's failure to discuss each mitigating factor in its sentencing opinion does not give rise to an automatic inference that the

factors absent from the opinion were not considered." *Obermiller* at ¶ 125, citing *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, ¶ 54. "Further, even if 'the trial court * * * should have more explicitly analyzed the mitigating evidence,' this court's independent reweighing will rectify the error." *Phillips* at 102, quoting *State v. Lott*, 51 Ohio St.3d 160, 171, 555 N.E.2d 293 (1990).

{¶ 173} In my dissent in *Roberts*, I stressed that the omission of any reference to what the defendant said during allocution in the sentencing opinion was not error in that case for these same reasons, and therefore, the omission cannot be error here. *See Roberts* at ¶ 101-120 (O'Donnell, J., dissenting).

_____

**LANZINGER, J., dissenting.**

{¶ 174} I respectfully dissent. The majority admits that the trial court "should have considered" Nathaniel Jackson's allocution in the resentencing opinion. Majority opinion at ¶ 83. But the new sentencing opinion had already been prepared prior to the resentencing hearing, and it was filed the same afternoon that the court heard Jackson's allocution and pronounced sentence. In other words, the court did not take Jackson's words into account before reimposing a sentence of death. This was the same trial-court error that we considered in *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, ¶ 96 ("*Roberts II*"), the case of Jackson's accomplice, Donna Roberts. There too, the trial court did not discuss allocution in its R.C. 2929.03(F) sentencing opinion. *Id.* at ¶ 64.

{¶ 175} I do not agree with the majority that this case differs from Roberts's case. The majority attempts to distinguish between the circumstances of this case and Roberts's case by saying that "[u]nlike the situation in *Roberts II*, Jackson's allocution during his resentencing hearing added little to the mitigation that was already before the court." Majority opinion at ¶ 86. I do not believe that this

distinction puts this case in line with *State v. Phillips*, 74 Ohio St.3d 72, 656 N.E.2d 643 (1995).

{¶ 176} The majority relies upon *Phillips* to support its decision to cure the error in the sentencing opinion through independent evaluation of Jackson's capital sentence. But *Phillips* did not involve a trial court's error of the same significance as that present in this case. There, the appellant challenged the sentencing opinion for failing to give effect to *all* mitigation evidence offered. *Id.* at 102. We noted that the appellant's argument "erroneously assumes that evidence that is not specifically mentioned in an opinion was not considered," and we explained that "[w]hile a sentencing court must consider all evidence in mitigation, it need not discuss each factor individually." *Id.*, citing *Parker v. Dugger*, 498 U.S. 308, 314-315, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). We concluded that even if the trial court should have more explicitly analyzed the mitigating evidence, our independent reweighing could rectify the error. *Phillips* at 102, citing *State v. Lott*, 51 Ohio St.3d 160, 171-172, 555 N.E.2d 293 (1990).

{¶ 177} This case involves more than just a trial court's failure to state sufficient detail in analyzing the mitigating evidence. Instead, there has also been a failure to even consider allocution in weighing the aggravating circumstances against the mitigating factors, a failure that, as the majority acknowledges, we found to violate the Eighth Amendment in *Roberts II*. Majority opinion at ¶ 81, citing *Roberts II*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, at ¶ 65, 69.

{¶ 178} The majority is correct in noting that our decision vacating Roberts's death sentence in *Roberts II* was premised upon the " 'unusual circumstances' " present in that case, including the potential for significant mitigation in Roberts's allocution, the lack of other offered mitigation, and the fact that the trial court had been specifically directed to consider allocution. Majority opinion at ¶ 81, quoting *Roberts II* at ¶ 64. These circumstances led us to determine

in *Roberts II* that the trial court's failure to mention the allocution in its sentencing opinion was more than a mere oversight. While Jackson originally presented more mitigation than Roberts did, and his allocution during his resentencing hearing was less significant than hers, I would hold that as in *Roberts II*, the failure of the trial court to mention allocution at all is more than the mere oversight found in *Phillips* and instead constitutes reversible error.

{¶ 179} Trial courts "must conduct proceedings in capital cases with a strict level of care that comports with their unique status." *State v. Clinkscale*, 122 Ohio St.3d 351, 2009-Ohio-2746, 911 N.E.2d 862, ¶ 23. As detailed in the procedural history set forth in the majority opinion, the Eleventh District Court of Appeals noted that the fact patterns in this case and in Roberts's case are "factually the same" and involved "the same drafting procedures involving the sentencing entry," and it concluded that Jackson was "entitled to the same relief afforded to his co-defendant." *State v. Jackson*, 190 Ohio App.3d 319, 2010-Ohio-5054, 941 N.E.2d 1221, ¶ 29 (11th Dist.). That relief included affording the defendant the right to allocate, requiring the trial court to personally review and evaluate the evidence, and requiring the court to personally prepare an entirely new penalty opinion. *State v. Roberts,* 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 167 ("*Roberts I*"). Just as happened during the resentencing at issue in *Roberts II*, the trial court here failed to comply with these instructions to conduct Jackson's resentencing with the strict level of care that comports with the unique status of a capital case.

{¶ 180} In vacating the death sentence of Jackson's accomplice, Roberts, we instructed the trial court in *Roberts II* how to sentence her properly:

> On remand, the trial court must consider all the mitigating evidence reflected in the record, including Roberts's allocution, weigh the aggravating circumstances against the mitigating factors, and file a sentencing opinion that reflects that it has complied with these

instructions.  In doing so, the trial court must make an independent determination of whether a death sentence is appropriate and may not give deference to the sentences previously entered.

*Roberts II*, 137 Ohio St. 3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, at ¶ 96.

{¶ 181} I would follow the mandates of this court in *Roberts I* and *Roberts II* and of the Eleventh District in *State v. Jackson* and grant Nathaniel Jackson the same remedy.  I respectfully dissent.

_____

Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos and Charles Morrow, Assistant Prosecuting Attorneys, for appellee.

Timothy Young, Ohio Public Defender, and Randall L. Porter, Assistant Public Defender; and Buell & Sipe Co., L.P.A., and Dennis L. Sipe, for appellant.

_____