[Cite as *State v. Robinson*, 2019-Ohio-387.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170147 |
| | | TRIAL NO. B-1603067 |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| DARYL SHAREEF ROBINSON, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Sentences Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal: February 8, 2019

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Phillip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson* and *Demetra Stamatakos*, Assistant Public Defenders, for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1}   In four assignments of error, defendant-appellant Daryl Shareef Robinson claims that he was improperly convicted and sentenced for murder, felonious assault, aggravated burglary, and aggravated robbery.  For the reasons set forth below, we conclude that the trial court failed to properly merge allied offenses of similar import, but affirm the judgment of the trial court in all other respects.

## *Marijuana Sale Results in a Shooting*

{¶2}   Robinson met Jordan Lane when Lane was working at Smiley's Drive-Thru in the Western Hills neighborhood of Hamilton County.  When Robinson purchased cigarillos, a type of cigar commonly used to smoke marijuana, Lane asked Robinson if he sold or used marijuana.  When Robinson told him that he did both, Lane told him that he also sold marijuana, and the two exchanged phone numbers.  Lane identified Robinson in his contacts as "D from Beechmont."

{¶3}   After exchanging messages for a few days, Robinson agreed to buy two ounces of marijuana from Lane.  Robinson met Lane at Lane's home, where Robinson met Justin Roll for the first time.  Roll was Lane's housemate and helped Lane with the sale of marijuana.  After buying the marijuana, Robinson repackaged it and sold it to his customers.  Some of the customers complained that the marijuana was poor quality, and Robinson contacted Lane about receiving a partial refund.  The two agreed on a refund of $50, and Robinson returned to Lane's home to receive the refund and purchase an additional two ounces of marijuana.

{¶4}   Kylie Gill, Lane's girlfriend and roommate, and Roll were present during that second exchange.  Robinson purchased the marijuana and then put it in a Dora the Explorer backpack that he carried around.  On May 28, Robinson contacted Lane about buying four ounces of marijuana.  Contact between the two continued through June 2, when there were 11 calls between Lane and Robinson.  Robinson

arrived at Lane's home shortly before 6 p.m. that evening, and Lane and Roll greeted him outside. No one else was home except for friends of Lane and Roll who were in the garage of the home listening to music and doing drugs.

{¶5} Robinson, carrying his Dora bag, followed Lane and Roll into the house and up the stairs to the second floor. They then turned left into Lane's bedroom, which was down the hall from Roll's. Lane's bedroom contained a bed near the outside wall and had an opening in the wall next to the doorway that was about two and one-half feet deep, which was used as a closet. Accounts vary as to what happened next, but the undisputed evidence shows that Lane handed Robinson the bag of marijuana, someone pulled out a black gun containing .40-caliber bullets, and, after a struggle, Robinson was pinned against the back wall of the closet and fired twice, fatally wounding Lane and seriously injuring Roll. Robinson then put the four ounces of marijuana in his Dora bag and left the house with the bag.

{¶6} After Robinson left, Roll FaceTimed Brandon Lane, Lane's twin brother, and told Brandon that they had been robbed and shot. Roll then managed to walk downstairs. Several of Lane and Roll's friends were in the garage at the time of the shooting. Roll told his friends that he and Lane had been robbed and shot.

{¶7} The friends went upstairs to Lane's bedroom and hid drug paraphernalia, such as bongs and bowls, in a cupboard above the closet. They then called 911 when they were leaving the house. Roll also called 911 but was not able to get through to a dispatcher. The first officer arrived at the scene around the time of Roll's 911 call and about eight minutes after the shooting. Paramedics then arrived and attended to Lane and Roll and took them to the hospital. Before Roll was taken away, he told the police that he knew his shooter as "D."

{¶8} Officers investigating the scene obtained Robinson's phone number from Lane's cellphone under his contact for "D from Beechmont" and traced the

number to Robinson. When searching Lane's bedroom, they found keys on a lanyard in the closet, Lane's clothes that had been removed by the paramedics on the floor outside the closet, and both Roll's and Lane's wallets placed on separate dressers. Additionally, they found a cardboard Kotex tampon box containing cash and drug paraphernalia in the cupboard above the closet. The police also recovered two .40-caliber casings and their corresponding bullets on the second floor of the house, but they did not recover a gun.

{¶9}    Shortly after the police had arrived at the house, Gill arrived and learned about the shooting. In her interview with the police, she mentioned marijuana and her previous encounter with Robinson, to which he had brought the Dora bag. Roll also mentioned the Dora bag when he was interviewed by the police after the shooting. He said that during the drug deal Robinson had pulled a black gun out of a Dora bag to rob him and Lane and then had fired at them after they forced him into the closet.

{¶10}    After learning that Robinson was a suspect, the police reviewed Real Time Crime Videos that showed Robinson's vehicle traveling on the road toward Lane and Roll's home a few minutes before the shooting, and then away from the home a few minutes after the shooting. Robinson's driver's side window was open at that time, despite the rainy weather condition, suggesting that he was disposing of something.

{¶11}    In the early morning on the day after the shooting, the police obtained a warrant for Robinson's arrest and decided to look for him at the apartment of Jenika Sally, his girlfriend, who lived on Beechmont Avenue. Robinson was in Sally's apartment at that time and had been there most of the evening after the shooting. While Robinson was in Sally's apartment, Sally's cellphone was used to communicate with her brother about the shooting. One text sent to her brother reads, "I just put

two more bullets ina gun couple days ago lol I saved him cuz it was empty. He hit them both[.]" Another text, sent shortly before Robinson's arrest but after Sally had received a text from her brother indicating that the police were at his home looking for Robinson, reads, "This daryl Is they gone[?]"

{¶12} When the police arrived at Sally's apartment, they announced their presence but Sally did not answer the door for a half hour. She eventually let them in and Robinson was apprehended and taken into custody. He declined to make any statement to the police.

{¶13} In Sally's apartment, the police found a Dora bag that contained the marijuana Robinson had taken from Lane. The police did not find a gun in Sally's apartment or car, or in Robinson's apartment or car, all of which were searched by officers. Later, Robinson was indicted on 12 counts, including aggravated murder, felony murder, felonious assault, aggravated robbery, and aggravated burglary, all with firearm specifications.

{¶14} At Robinson's trial, the state presented testimony concerning the police investigation of the shooting, including testimony from Detective Gregory, who had attempted to interview Robinson after he had been taken into custody. The state also presented testimony from the witnesses who had been interviewed by the police about the shooting. These witnesses testified consistent with their statements to the police, including Roll.

{¶15} Roll maintained that after Lane had offered Robinson the drugs, Robinson had rejected them and pulled his black gun out of the Dora bag. Robinson then ordered him and Lane to empty their pockets. Roll said that after he and Lane threw their wallets on the floor, Robinson pointed the gun directly at him and cocked it. Lane asked, Why are you doing this?," and lunged out of the chair he had been sitting in and pushed Robinson's hand so the gun was pointing down. Lane, still

facing Robinson, then wrapped his arms around Robinson's waist, in a tackle position, while Roll stood behind Lane and pushed on Robinson's face with his hands. The two drove Robinson six or seven feet across the room and Robinson's back hit the wall of the closet. Roll heard gunshots and next remembered lying on the floor next to Lane, with both bodies partially in the closet.

{¶16} The state also presented evidence showing that Lane had never been seen with a gun, but Robinson had. Several witnesses including Roll and Gill testified that they had never seen Lane with a gun. Roll and Gill also testified that, a few weeks before the shooting, Robinson had showed them a black gun that he had taken out of his Dora bag at a drug deal.

{¶17} Further, Sally testified that in the months before the shooting, she had seen Robinson with multiple handguns, including a black one and a silver one. And Sally confirmed that about an hour after the shooting she had sent her brother a text message claiming that she had previously put into Robinson's gun the two bullets that struck the victims. On cross-examination, however, Sally indicated that the gun she was referring to in the text was a .380-caliber gun and that she had assumed Robinson had used that gun in the shooting. The gun involved in the shooting contained .40-caliber bullets.

{¶18} Sally also testified that about 18 minutes after the shooting, Robinson had called her and asked her to pick him up at his apartment. She indicated that when she arrived in the parking lot of his apartment, Robinson "just got in the car and [they] drove off" to her apartment, where they stayed until the police arrived hours later. Sally said Robinson appeared calm and was quiet, telling her nothing about the shooting. She further claimed she learned everything about the shooting from her brother and friends.

{¶19}   Dr. Karen Looman, who performed Lane's autopsy, testified that Lane died of a single gunshot wound to the chest.  On direct examination, she explained that "stippling" around Lane's bullet wound and the angle of the wound led her to conclude that Lane must have been shot from at least three to four feet away, possibly while backing away.  On cross-examination, however, Dr. Looman testified that the clothing Lane had been wearing would have absorbed some of the stippling, and that she was not sent Lane's clothing to test.   Dr. Looman opined that, considering the clothing, the shot could have been fired from approximately three inches to three to four feet away.

{¶20}   After the state rested, Robinson asserted the defense of self-defense, presenting in support his own testimony and that of Tracey Partee, his mother. Partee testified that she had received a phone call from Robinson around 28 minutes after the shooting.  During the call, Robinson seemed "nervous" and "scared."  He told her he "had been jumped by two guys" who had tried "to rob" him, "and a fight [had] ensued with both of them, and there was a gun that was involved, and he had to wrestle and fight with them, and he actually ended up shooting both." She "begged" him to go to the police, but he did not.

{¶21}   Robinson testified on direct examination that it was Lane who had produced a gun during the drug deal and had ordered Robinson to hand over his money.  At the time, Lane and Roll were standing closer to the bed and the outside wall of the bedroom, and he was standing closer to the closet and bedroom doorway, but facing Lane and Roll. According to Robinson, while Lane was distracted by Robinson's hand movements in his pocket to retrieve his money, he knocked the gun from Lane's hand and it fell to the floor near the bed, about a foot in front of him and a foot in front of Lane and Roll.  Robinson said that he then kicked the gun and it

landed near the closet. He bent down toward the gun and Lane and Roll started punching and pushing him.

{¶22} According to Robinson, Lane and Roll repeatedly punched him in the face. He protected himself from their punches while "backpedaling" to push them away from the gun, successfully staying between them and the gun, and then squatted down and picked up the gun. Lane and Roll then drove him into the closet wall with such force that the wall cracked. Robinson claimed that he struck the wall with his back and was face-to-face with Lane and Roll with the gun in his right hand and his left hand fending off punches. Fearing that Lane and Roll would push him through the wall and down the stairs on the other side, he raised the gun, closed his eyes, and fired two shots in the direction of Lane and Roll. Both men hit the ground. Robinson then dropped the gun, grabbed the Dora bag and the four ounces of marijuana he had come to purchase, and left the house.

{¶23} Robinson further indicated that after the shooting he drove to his home and called his mother on his cellphone while on his way there. He told her that he had been jumped during a drug deal and had shot his assailants, and she advised him to turn himself in to the police. When he arrived outside his home, Robinson realized he had lost the lanyard holding the keys to his home that had been around his neck, and he called Sally to pick him up. She picked him up and drove him to her apartment, where he was later arrested.

{¶24} On direct examination, Robinson denied ever bringing a gun to any drug deal, but acknowledged that he had owned a .380-caliber gun at the time of the shooting. He claimed that he still owned that gun and kept it inside his home for safety.

{¶25} On cross-examination, the state asked why the police did not find that .380-caliber gun when they searched his home during the investigation. For the first

time, Robinson claimed that after the shooting, but before he left with Sally for her apartment, he had conducted a drug sale inside his home and had given the gun to the purchaser so the police would not find it.

{¶26} Also on cross-examination, Robinson acknowledged that he had previously owned a black gun, but it was a 9 mm, and that he had not turned himself into the police even though his mother had begged him to do so. He claimed that he had intended to turn himself in the day after the shooting, but first wanted to see Sally and her young daughter.

{¶27} After Robinson rested, the state recalled Detective Gregory to rebut Robinson's claim that Lane and Roll had repeatedly punched him in the face. The detective said that when he was in close contact with Robinson after his arrest, he had not observed any injuries to Robinson's face. This testimony was corroborated by photographs taken of Robinson during the booking process that were admitted as evidence.

{¶28} At the conclusion of the trial, the jury found Robinson guilty of the felony murder of Lane as charged in count three of the indictment, the serious-physical-harm felonious assault of Lane as charged in count four, the deadly-weapon felonious assault of Lane as charged in count five, the serious-physical-harm felonious assault of Roll as charged in count six, the deadly-weapon felonious assault of Roll as charged in count seven, aggravated burglary with use of a deadly weapon as charged in count eight, aggravated burglary with physical harm to Lane as charged in count nine, aggravated burglary with physical harm to Roll as charged in count ten of the indictment, the aggravated robbery of Lane as charged in count 11 of the indictment, and the aggravated robbery of Roll as charged in count 12 of the indictment. The jury also found Robinson guilty of each of the gun specifications attached to those counts. The jury acquitted Robinson of aggravated murder as

charged in count one, the murder as charged in count two, and the specifications attached to those counts.

## *Assignments of Error*

{¶29} Raising four assignments of error, Robinson claims that his convictions and sentences were improper. In his first assignment of error, Robinson claims that his right to due process and his right to remain silent were violated when evidence of his "post-arrest, post-*Miranda*" silence was presented to the jury and improperly relied upon by the state during closing argument. In his second assignment, he claims that trial counsel was ineffective for failing to file a motion to suppress evidence that was obtained during the search of Sally's apartment. In his third assignment of error, Robinson claims his right to a fair trial was compromised when the state failed to present material evidence to the coroner, which resulted in the coroner's conclusions being unreliable. Finally, Robinson argues that the trial court failed to merge counts which were allied offenses of similar import. We will address each assignment in turn.

## *Use of the Defendant's Silence*

{¶30} The Due Process Clause is violated when, through *Miranda* warnings, the state promises that an arrestee's silence will not be used against him and then breaches that promise by later using his silence as either substantive evidence of guilt, or as impeachment evidence. *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Wainwright v. Greenfield*, 474 U.S. 284, 295, 106 S.Ct. 634, 88 L.Ed.2d 263 (1986). This violation is rooted in the concept that it would be fundamentally unfair for the state to induce a defendant's silence through a promise that it later breaches. *Doyle* at 618; *Wainwright* at 295; *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 18. The state may not use a defendant's silence to lead the jury to the conclusion that innocent people speak to

the police to clear up misunderstandings, while guilty people consult with their attorneys. *See Leach* at ¶ 32.

{¶31} Additionally, the Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." It is well-established that the state's use of defendant's prearrest, pre-*Miranda* silence, and post-arrest, post-*Miranda* silence, as substantive evidence of guilt violates the Fifth Amendment's protection against self-incrimination. *Leach* at ¶ 24-31; *State v. Steelman*, 1st Dist. Hamilton No. C-170337, 2018-Ohio-1732, ¶ 16 (holding a Fifth Amendment violation occurred where the state used the defendant's prearrest silence as substantive evidence of guilt); *see generally Combs v. Coyle*, 205 F.3d 269 (6th Cir.2000) (prearrest silence may not be used as substantive evidence of guilt); *Miranda v. Arizona*, 384 U.S. 436, 468, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), fn. 47 ("[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation.").

{¶32} However, if the defendant testifies at trial, the state may use the defendant's pre-*Miranda* silence for impeachment purposes. *See Leach* at ¶ 21-23, citing *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), and *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982).

{¶33} Robinson refers to three separate instances during Detective Gregory's testimony during the state's case-in-chief where he claims that his post-arrest, post-*Miranda* silence was improperly referenced. In the first instance, the prosecutor asked the detective, who had investigated the shooting, whether he knew where Robinson had gone between the time of the shooting and the time he was found in Sally's apartment. The detective responded that "[w]e did interviews of

11

Jenika Sally. We did get some information from the defendant, but he declined to make a statement." Defense counsel objected, asserting that the state was not allowed to comment on the defendant's failure to make a statement. The state argued it was merely explaining the course of the police investigation. The trial court overruled that objection. In the second instance, the state was questioning Gregory about the course of the investigation, specifically about when Robinson's DNA was taken, asking "during that attempt to interview the defendant, did you also perform swabs on the defendant?" Gregory responded that the swab was taken at a later date. Defense counsel did not object to this question. In the third instance, the state began to ask the question "when [was] the first time you heard of any self-defense * * *." The prosecutor did not complete the question before defense counsel objected, and the trial court sustained the objection.

{¶34} We first note the record does not support Robinson's claim that Detective Gregory's testimony was directed to his post-*Miranda* silence. Certainly, Detective Gregory's testimony references a time period after Robinson's arrest. But whether or when Robinson was *Mirandized* is not clear on this record. Robinson contends the record demonstrates he had been *Mirandized* at the time of his arrest because the transcript of proceedings contains comments by defense counsel and the prosecutor, when discussing an objection at a sidebar, agreeing that Robinson had asked for an attorney after his arrest. The state does not address the issue of whether and when Robinson was *Mirandized* in its brief. Ultimately, whether Robinson was *Mirandized* is of no consequence for our resolution of this assignment of error, because the challenged testimony would be impermissible as substantive evidence of Robinson's guilt regardless.

{¶35} In the first instance, Detective Gregory expressly referred to Robinson's decision to remain silent and not make a statement. This testimony

occurred during the state's case-in-chief and before Robinson testified. As a result, it was a clear violation of the defendant's right to remain silent because the state used Robinson's silence as substantive evidence of guilt. Counsel objected on this basis, and the trial court improperly overruled that objection.

{¶36} In the second instance, the state referenced Robinson's refusal to give a statement, without objection, asking the detective, "Now, during that attempt to interview the defendant, did you also perform swabs of the defendant?" This question impermissibly referenced the defendant's silence, but it was not objected to, likely because the reference was so innocuous.

{¶37} In the final instance cited from Gregory's testimony, the state asked the detective, "When is the first you heard of any sort of self-defense * * *?" Defense counsel objected before the prosecutor could finish the question, and before Gregory could respond. The trial court sustained the objection.

{¶38} In addition to the three cited instances during Gregory's testimony, Robinson also claims that comments made by the state during closing arguments improperly referenced his post-*Miranda* decision to remain silent. During closing, the assistant prosecuting attorney stated that Robinson had had eight months, which was the time that had elapsed between the shootings and trial, to review the evidence before telling his story, and that Robinson "conveniently" had facts to counter the strongest evidence against him. Counsel objected, but the objection related to the use of the word "conveniently." The objection was overruled. The prosecutor also said during closing, without objection, that Robinson had had eight months "to think about what kind of bullcrap lies to tell * * * ."

{¶39} Ultimately, Robinson contends that cumulatively the state's references to his post-*Miranda* silence constituted constitutional error that was not

harmless beyond a reasonable doubt. But on this record, we cannot agree with Robinson.

{¶40} First, the challenged comments contained in the state's closing argument were made by the state after Robinson had testified. This is important because, while the state is never allowed to use as defendant's pre- or post-*Miranda* silence as substantive evidence of guilt, and may not impeach a defendant's credibility by referencing his post-*Miranda* silence even if the defendant testifies, the state is permitted to impeach a testifying defendant's credibility by referencing his pre-*Miranda* silence. *See Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335. Robinson ignores these distinctions in the law with respect to the state's comment on a defendant's silence, and argues instead that the state's closing argument was nothing more than the further impermissible use of Robinson's post-*Miranda* silence as substantive evidence of his guilt.

{¶41} Second, the state's comments during closing argument were at least in part directed to the permissible impeachment of Robinson's failure to claim self-defense before his arrest. The record demonstrates that the prosecutor asked Robinson on cross-examination why he did not go to the police immediately after the shooting to tell his side of the story, as his mother had urged him to do. Thus, the state's challenged comments in closing were impermissible only to the extent that the state was asking the jury to do more than infer Robinson's own testimony was incredible based on his pre-*Miranda* silence. We cannot reliably determine what time period the state could refer to when seeking to impeach Robinson this way, because Robinson failed to establish in the record if or when he was promised that his silence would not be used against him.

{¶42} Finally, accepting that the challenged comments during the state's closing were not just fair commentary on Robinson's credibility in light of his pre-

14

*Miranda* silence, but also impermissibly encouraged the jury to infer Robinson's guilt from his silence, the impact on the jury from these impermissible references to Robinson's silence, when considered along with the impermissible references to Robinson's silence during the state's case-in-chief, could not be sufficient to warrant the reversal of Robinson's convictions, because the error caused by the state's improper use of Robinson's silence was harmless beyond a reasonable doubt.

{¶43} The state's evidence of Robinson's guilt was overwhelming. Roll's testimony concerning the shooting was not impeached and was corroborated by the physical evidence, including the location of the four-ounce bag of marijuana in Robinson's Dora bag at Sally's apartment, and the location of Roll's wallet in Lane's bedroom. His testimony was also corroborated by the testimony of the other state's witnesses. For instance, Gill's testimony confirmed that Robinson had brought a black gun to a drug deal occurring in Lane's bedroom several weeks before the shooting. Sally's testimony confirmed that Robinson owned a black gun. And Sally's text message to her brother after the shooting indicated that she had recently put exactly two bullets in Robinson's gun shortly before the shooting. Sally tried to make her text message irrelevant during her cross-examination, by claiming that the gun she was referring to in the text was Robinson's .380-caliber gun and not the .40-caliber gun Robinson used to shoot Lane and Roll, but we reject that testimony as incredible.

{¶44} We arrive at this conclusion because Robinson's testimony concerning the location of that .380-caliber gun lacked credibility. The state questioned him about that gun on cross-examination, and he claimed that he kept it in his home for protection and still owed it. Only when the state inquired as to why the police did not find a .380-caliber gun when they searched his residence did he claim that he had given it to an unnamed individual to whom he sold marijuana in

his home after the shooting but before he went to Sally's apartment. This explanation, however, was incredulous because Robinson had already indicated that he did not have a key to his residence at that time. Robinson then suggested that Sally had let him into his apartment, but this conflicted with Sally's testimony and Robinson's prior testimony that after Sally arrived, Robinson just entered her car and drove with Sally to her apartment.

{¶45} In addition, Robinson's alternate explanation for the shooting, particularly how he ended up with what he claimed was Lane's gun, strains credibility. Robinson claimed he repeatedly received hard blows to his face during the struggle over the gun, but Detective Gregory did not see physical evidence of such injuries after Robinson's arrest, a fact that is corroborated by Robinson's booking photographs.

{¶46} We conclude that the brief, improper comments at issue here did not permeate or taint the lengthy proceedings in light of the overwhelming evidence of guilt. Consequently, we hold the trial court erred when it allowed the state to present evidence of Robinson's silence as substantive evidence of his guilt, but that any prejudice from the state's improper use of Robinson's silence was harmless beyond a reasonable doubt as the evidence against him was overwhelming. Accordingly, we overrule Robinson's first assignment of error.

### Ineffective Assistance of Counsel

{¶47} In his second assignment of error, Robinson claims that his trial counsel was ineffective for failing to file a motion to suppress the Dora the Explorer backpack and the evidence recovered during the search of the apartment that had been authorized by a warrant that had been obtained by referencing finding the Dora the Explorer backpack.

{¶48} To succeed on his ineffective-assistance claim, Robinson must establish that trial counsel was deficient, and that, absent his counsel's errors, the result of the proceedings would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 199. Failure to file a motion to suppress does not make trial counsel per se ineffective. *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 126. The failure to make either the deficiency or prejudice showing defeats a claim of ineffective assistance of counsel. *Strickland* at 697. Thus,

> a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Id.* To demonstrate that the deficient performance prejudiced him, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Id.* at 694.

{¶49} We cannot say that the outcome of this case would have been different had the motion to suppress been filed. Investigators knew that Robinson was the suspected shooter immediately upon speaking to the witnesses. Robinson was quickly tied to the two victims through cellphone records. He was recorded leaving the area on video surveillance shortly after the shooting. Had the search of the apartment resulted in finding a weapon owned by Robinson that could be tied to the shooting, the results might have been different. But the only evidence recovered from the search of Sally's apartment were ancillary to the core issue of the case: whether it was Robinson or Lane and Roll who had attempted to turn the drug sale

17

into a robbery. And Robinson testified at trial that he had brought the backpack to the scene and that he used it during drug transactions. As a result, the recovery of the backpack did not prejudice him. Because Robinson can show no prejudice, we cannot conclude that any error in counsel's failure to file a motion to suppress should result in a reversal of his convictions. We overrule his second assignment of error.

### *Failure to Disclose Evidence*

{¶50} In his third assignment of error, Robinson claims that his right to a fair trial was compromised when the state failed to correct erroneous testimony from the assistant coroner, who estimated the distance from which the victims were shot based on the lack of gunshot stippling on Lane's skin. The assistant coroner had not been informed that there was a sweatshirt in evidence with bullet holes in it, which could have been worn by Lane when he was shot, and would have negated her conclusion about the distance between Robinson and Lane.

{¶51} A conviction obtained through use of known, uncorrected false testimony is a denial of due process. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In this case, the assistant coroner issued a report indicating her calculation of the shooter's distance from Lane based upon the lack of gunshot stippling on his skin. The assistant coroner then testified that "[t]he characteristics of the wound and the fact there's no stippling or fouling tells me, I call the wound indeterminate, so it's a far away shot. So three to four feet to infinity is how far away the person was when they shot him."

{¶52} But, unlike in *Napue*, the misinformation in this case was corrected. On cross-examination, defense counsel presented the sweatshirt to the coroner, who admitted she had not examined it before. The coroner admitted that she would have wanted to examine the sweatshirt, and that had the victim been wearing the sweatshirt, her findings would have been different. Since the jury was able to hear

how wearing the sweatshirt would have changed her calculations of distance, we cannot conclude that Robinson's due-process rights were violated by the initial testimony presented by the state. We overrule his third assignment of error.

*Allied Offenses of Similar Import*

{¶53} In his final assignment of error, Robinson claims that the trial court failed to merge for sentencing certain allied offenses of similar import. He maintains that all of the offenses pertaining to Lane merge with each other and that all the offenses pertaining to Roll merge with each other. We find some merit to Robinson's claim and determine that the matter must be remanded to address this issue.

{¶54} The jury found Robinson guilty of the following offenses: count three, murder, for causing the death of Lane while committing the crime of felonious assault, in violation of R.C. 2903.02(B); count four, felonious assault, for causing Lane serious physical harm, in violation of R.C. 2903.11(A)(1); count five, felonious assault, for causing physical harm to Lane by means of a deadly weapon, in violation of R.C. 2903.11(A)(2); count six, felonious assault, for causing Roll serious physical harm, in violation of R.C. 2903.11(A)(1); count seven, felonious assault, for causing physical harm to Roll by means of a deadly weapon, in violation of R.C. 2903.11(A)(2); count eight, aggravated burglary, for trespassing in the home to commit a criminal offense while possessing a deadly weapon, in violation of R.C. 2911.11(A)(2); count nine, aggravated burglary, for trespassing in the home to commit a criminal offense and causing physical harm to Lane, in violation of R.C. 2911.11(A)(1); count ten, aggravated burglary, for trespassing in the home to commit a criminal offense and causing physical harm to Roll, in violation of R.C. 2911.11(A)(1); count 11, aggravated robbery of Lane, in violation of R.C. 2911.01(A)(3); and count 12, aggravated robbery of Roll, in violation of R.C. 2911.01(A)(3). At sentencing, the trial court merged counts four, five and 12 with

19

count three, count seven with count six, specification one to count three with specification two to count three, specification one to count six with specification two to count six, and both specifications one and two to counts seven, eight, nine, ten, and 11 with specification two of count three.

{¶55} The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution, and the Ohio Constitution, Article I, Section 10, protect a defendant against multiple punishments for the same offense. *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶ 7; *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). This constitutional protection is codified in R.C. 2941.25. *See State v. Cabrales*, 118 Ohio St.3d 54, 2008-Ohio-1625, 886 N.E.2d 181, ¶ 23. R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶56} The Ohio Supreme Court set forth the test to determine if two offenses are allied offenses of similar import in *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892. It explained:

Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must

focus on the defendant's conduct to determine whether one or more convictions may result because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Id.* at ¶ 30-31. Moreover, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414, ¶ 128, quoting *Ruff* at ¶ 26.

{¶57} When offenses must merge under R.C. 2941.25(A), the defendant can be found guilty of all, but can be punished only on one.

{¶58} We first address the counts specifically related to Lane. This court has held that "where the conduct that constitutes one offense causes a harm that is not separate and identifiable from the harm caused by the aggravating element of another offense, then the offenses are of a similar import." *State v. Ruff*, 1st Dist. Hamilton No. C-120533, 2015-Ohio-3367, ¶ 18. In *Ruff*, decided after remand from the Ohio Supreme Court, the defendant had been convicted of multiple instances of rape and aggravated burglary that required a showing of physical harm. The only physical harm suffered by

the victim had been the rape. This court held that those counts were subject to merger because "[t]he element of physical harm for each aggravated burglary was established by Ruff's rape of the victim. The harm that resulted from the rape of each victim was the same harm that resulted when each burglary escalated to aggravated burglary. Thus, the harms were not 'separate and identifiable' " and were allied offenses were of similar import. *Id.* at ¶ 19.

{¶59} The conduct that constituted the felonious assault of Lane and resulted in his death was not separate and identifiable from the harm caused by the felonious assault that served as the predicate offense for felony murder and the aggravating elements of aggravated robbery and aggravated burglary. Further, the evidence demonstrated that these offenses were neither committed separately nor with a separate animus. Lane was shot one time. That conduct was the sole basis for the felonious-assault charge as well as the sole element of physical harm that was the predicate offense for the felony-murder count and the aggravating factor for the aggravated-robbery and aggravated-burglary counts. The trial court should have found that all of these offenses were subject to merger, and erred to the extent that it did not. For similar reasons, we conclude that all the offenses specifically related to Roll merge, and the trial court erred to the extent it failed to find them subject to merger.

{¶60} The remaining offense we must address does not relate specifically to either victim. Count eight accused Robinson of aggravated burglary for trespassing in the home to commit a criminal offense while possessing a deadly weapon, in violation of R.C. 2903.11(A)(2). In the trial court, Robinson argued this offense related to the harm inflicted on Lane and merged accordingly with the other offenses predicated on that physical harm. We disagree with this argument.

{¶61} The aggravated burglary charged in count eight was not predicated on the physical harm inflicted on Lane. Instead, the aggravating factor was based on

Robinson's possession of a deadly weapon while committing the burglary. The harm from bringing a weapon into a home is separate and identifiable from the harm resulting when you use that weapon. Thus, the offense alleged in count eight involved an import separate from the other offenses, including the offense charged in count nine.

{¶62} Robinson also argues that count eight merges with the other two aggravated-burglary counts, citing *State v. Burton*, 7th Dist. Jefferson No. 13 JE 39, 2015-Ohio-2247. The *Burton* court determined that because "the heart of an aggravated burglary is the trespass," where the facts show one identifiable trespass, there cannot be any separate harm inflicted by that trespass into the home, even if there were victims who suffered separate, identifiable physical harm as a result of that trespass and that harm was charged against the defendant to elevate a simple burglary to an aggravated burglary. *Id.* at ¶ 63. This analysis, however, conflicts with our holding in *Ruff*, following remand from the Ohio Supreme Court, that aggravated-burglary offenses can involve two distinct harms, there the intrusion in the dwelling and the subsequent physical harm caused by the rape of the occupant. *Ruff* at ¶ 13. Because the holding in *Burton* conflicts with our holding in *Ruff*, we do not follow it.

{¶63} For the reasons set forth above, we sustain Robinson's fourth assignment of error in part, and overrule it in part.

### Conclusion

{¶64} For the reasons set forth above, we overrule Robinson's first three assignments of error. We sustain the fourth assignment of error in part, and overrule it in part. The judgment of the trial court is affirmed in part, the sentences imposed on counts three, six, nine, ten, and 11 are hereby vacated, and the cause is remanded for the limited purpose of allowing the state to elect under which of the counts we have found to

be subject to merger it wishes to proceed and for the trial court to merge those counts in resentencing Robinson.

Judgment affirmed in part, sentences vacated in part, and cause remanded.

**CUNNINGHAM, J.**, concurs.
**MILLER, J.**, dissents.

**MILLER, J.,** dissenting.

{¶65}    The state used Robinson's silence as substantive evidence of his guilt, in violation of Robinson's Fifth Amendment right against self-incrimination. In my opinion, this error was not harmless beyond a reasonable doubt. I therefore respectfully dissent.

{¶66}  The facts in this case were largely undisputed.  Robinson admitted to the shootings. The main issue for the jury was: Who drew the gun first, Lane or Robinson?  The answer depended solely on whom the jury believed, as the physical evidence in this case was utterly inconclusive.  Unlike the majority, I would find that the assistant prosecutor's comment during closing that Robinson had had eight months to review the evidence before telling his story also violated Robinson's right to remain silent.  *See State v. Thompson*, 33 Ohio St.3d 1, 4, 514 N.E.2d 407 (1987) ("Comments by prosecutors on * * * silence * * * by defendants have always been looked upon with extreme disfavor because they raise an inference of guilt from a defendant's decision to remain silent."); *see also Girts v. Yanai,* 501 F.3d 743, 759-761 (6th Cir.2007) (prosecutor's statements during closing constituted reversible error because they implied that if the defendant was innocent he would have spoken to the police and testified at trial); *see generally Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (the Fifth Amendment forbids comment by the prosecution on the accused's silence).  Silence as evidence of Robinson's guilt was a theme that the state capitalized on to help secure the convictions.

**{¶67}**  I cannot conclude that Robinson's version of events so strained credibility as to meet the state's burden on appeal to demonstrate that its use of Robinson's silence against him was harmless beyond a reasonable doubt. *See State v. Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15 ("During a harmless error inquiry, the state has the burden of proving that the error did not affect the substantial rights of the defendant."). I would therefore reverse the trial court's judgment and remand this cause for a new trial.

Please note:

The court has recorded its own entry on the date of the release of this opinion.